Barbara JACKSON, Plaintiff,

v.

HARVARD UNIVERSITY and John H. McArthur, Defendants.

Civ. A. No. 84-4101-WD.

United States District Court,
D. Massachusetts.

Aug. 14, 1989.

1398

Evan T. Lawson, Lawson & Wayne, Boston, Mass., for plaintiff.

Allan A. Ryan, Jr., Office of the Gen. Counsel, Cambridge, Marc Goodheart, Hill & Barlow, Boston, Mass., for defendants.

## MEMORANDUM

WOODLOCK, District Judge.

Barbara Jackson brings this sex discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, against Harvard University and John H. McArthur, Dean of the University's Graduate School of Business Administration (the "Business School"). Ms. Jackson was denied tenure in the Marketing Area at the Business School in 1983. She alleges that the process by which she was denied tenure was tainted with sexual discrimination.

The case was tried without a jury over an eight-day period, and the evidence was thereafter reopened to receive documents belatedly produced by defendants. For the reasons presented below, I find the evidence fails to establish discrimination against Ms. Jackson on account of her gender. Accordingly, judgment will enter for the defendants.

This memorandum sets forth the findings of fact and conclusions of law required for resolution of this nonjury matter. *See* Fed.R.Civ.P. 52(a).

Before turning to a detailed presentation of the findings and conclusions, however, it will be useful to provide as an overview a concise statement of my determinations in this case.

## I.

### OVERVIEW

■ This case concerns a faculty tenure decision upon which reasonable people could and did disagree. The plaintiff Jackson, although a talented academic, failed on two occasions to convince a critical mass of the tenured faculty at the Business School that she should herself be admitted to tenured status. Lacking that critical mass of support, Ms. Jackson's candidacy did not receive the necessary support of the defendant Dean McArthur.

The evidence presented satisfies me that the judgment not to recommend Ms. Jackson for tenure was not infected by considerations of gender in any way. It was instead a determination on the merits as to which a large number of people of good will differed without reference to improper considerations. There was no direct evidence of discrimination presented; indeed, none of Ms. Jackson's supporters for tenure—numbering slightly over half the tenured faculty who participated at the critical meetings—came forward to testify that gender considerations played any role in the rejection of their position. Nor does any of the circumstantial evidence adduced by Ms. Jackson provide an alternative basis for finding a discriminatory cause in the denial of tenure.

Given the state of the evidence, the resolution of this case should have been relatively prompt and the determination clear in favor of the defendants. However, given the lack of assistance from the parties in producing relevant evidence, the judicial decision-making process was rendered time consuming and laborious. But at the conclusion of that process the proper outcome continues to be clear. Nothing in the lengthy evaluation given the record in this case has disclosed any reason to believe that Ms. Jackson's gender played a part in the decision of the defendant Harvard, acting through its agent Dean McArthur, to deny her tenure at the Business School.

The tenure process at the Business School makes Dean McArthur the pivotal figure. His decision to recommend or not to recommend an individual for tenure to the President and governing bodies of Harvard is effectively dispositive. But the Dean's decision itself turns upon whether a substantial majority of the tenured faculty favor tenure for the individual under consideration. In the case of Ms. Jackson, there was no substantial majority for tenure; rather, the faculty was about evenly split on the question when it was presented to them for a final vote, first in 1981, and again in 1983.

The tenure process for Ms. Jackson followed the traditional pathway in 1981. A

Subcommittee, formed to review her work, generated a detailed report and made its own recommendation. By a 3–1 vote the Subcommittee found Ms. Jackson met the standards for tenure. The one dissenter took the position that while she did not meet the standards she should nevertheless be granted tenure as an exceptional case.

The tenure question was then taken up by the tenured faculty as a whole. Following customary practice, a preliminary vote was taken after a preliminary discussion of Ms. Jackson's qualifications, and she received a substantial majority in support of tenure. However, when the final vote was taken less than a month later, Ms. Jackson's substantial majority had evaporated and only a slight majority continued to support her tenure candidacy. Although obviously relevant, this rapid evaporation of support was not the topic of any evidence adduced by the parties at trial.

Faced with only this slight majority of support for Ms. Jackson after the 1981 tenure votes, Dean McArthur chose a somewhat unusual approach. Rather than employing the customary one-year termination appointment ordinarily extended tenure candidates who fail to obtain substantial faculty support, the Dean organized a series of meetings designed to fashion a strategy to meet the perceived deficiency in the record Ms. Jackson presented: her lack of sufficient creativity. During the spring of 1982 interested members of the faculty met with her to define a project which would satisfy those who had opposed her tenure candidacy.

Such a project was developed that spring. And despite reservations about the definition given it, Ms. Jackson—who was relieved of any classroom responsibilities to allow her to devote full time to the project—began her work. Dean McArthur made clear that the project did not need to be completed before the end of February 1984. He further indicated that the final deadline could be extended to the late summer or fall of 1984. Nevertheless, Ms. Jackson decided to complete the project as quickly as possible. She submitted a draft to certain tenured professors in her Area over the summer of 1983. In memoranda delivered in early August, two of the reviewers criticized this draft severely because of its superficiality. Heedless of these harbingers that her performance on the project was not meeting with support from interested representatives of the group whose substantial support she would need to achieve tenure, Ms. Jackson submitted her final version at the end of August 1983, within a month after receiving the severely negative comments and well before any deadline for submission.

Predictably, Ms. Jackson's rush to judgment in the face of adverse comments did not improve her tenure chances. The 1983 Subcommittee recommended unanimously against tenure for Ms. Jackson and the full tenured faculty voted in favor of tenure for her by only a modest majority, well short of the substantial majority Dean McArthur considered necessary before he would recommend tenure. At this point, Dean McArthur offered the termination appointment; Ms. Jackson left the Business School and this litigation ensued.

On their face, nothing in these proceedings fairly suggests Ms. Jackson was discriminated against on the basis of her sex in the Business School's tenure decision. I have found nothing in the direct evidence concerning that process to support such a claim. Ms. Jackson, however, has also raised a collection of circumstantial matters which she maintains support her contention. Broadly stated, these circumstantial matters relate to the environment at the Business School, purported irregularities in its procedures as applied to Ms. Jackson's candidacy, and alleged disparate treatment of male tenure candidates. I have analyzed these matters in great detail and find nothing beneath the surface which supports Ms. Jackson's position. The circumstantial matters reduce to a collection of attenuated, dated, and immaterial incidents and stray remarks, *de minimus* procedural anomalies, and inapposite comparisons with other tenure candidates.

Viewing the appropriate judgment as extraordinarily clear, I was prepared to decide this case from the bench adversely to

the plaintiff with an *ore tenus* decision dictated into the record. During the course of trial it also became clear, however, that the defendants, in addition to a very strong case, were benefitting improperly from their own discovery misconduct and the operation of certain misconceived pre-trial discovery rulings. Prior to trial the defendants destroyed documents they were under a court order to produce. They also availed themselves of a spurious privilege not to disclose the particulars of tenure discussions and evaluations. When it developed that the defendants had in addition not responded fully to pre-trial document demands, I offered the plaintiff *sua sponte* the opportunity to conduct further discovery to counteract these evidentiary limitations. She rejected this opportunity to adduce additional relevant evidence and pressed only for sanctions which would relieve her of the burden of proving her case by the introduction of evidence. The imposition of such sanctions, however, was unacceptable to me as a means of resolving factual disputes.

In deciding this case I found an absence of evidence which the parties should have adduced but for various reasons neither proposed to offer nor ultimately even sought to discover. Concerned that the defendants not benefit unfairly by their own misconduct and what I came to conclude were erroneous pre-trial privilege determinations, I found it necessary to read and reread the documentary submissions and trial testimony to assure myself that I had accounted for all the links—even those missing from the evidence offered by the parties—in the chains which bind this case together. After undertaking this extensive review, I am satisfied that my initial tentative judgment was correct.

In summary, there is in this case no basis on which to find gender discrimination against the plaintiff in her tenure review. It is simply a case presenting the supportable conclusion of a university and its responsible Dean that a member of a protected class—Ms. Jackson, a qualified female

tenure candidate—did not satisfy the necessarily subjective standards which guide tenure determinations. There is here insufficient—indeed virtually no—evidence that illicit discriminatory motives were at work. Thus, I am not free to interpose whatever independent views I might harbor regarding the merits of Ms. Jackson's tenure candidacy but must enter judgment for the defendants.

## II.

### LEGAL PRINCIPLES

In the taxonomy of Title VII, this action is an "individual disparate treatment" case. The Supreme Court has explained the "basic allocation of burdens and order of presentation of proof" in such cases as a three-step process:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)); *see also Fields v. Clark Univ.*, 817 F.2d 931, 934 (1st Cir.1987).

To prove a prima facie Title VII case for discriminatory denial of tenure, a woman in the position of Ms. Jackson must show

(a) that as a candidate for tenure she was qualified under Business School standards, practices, or customs;[1]

---

**1.** With respect to this element, the plaintiff " 'need only show that [she] was sufficiently

qualified to be among those persons from whom a selection, to some extent discretionary,

(b) that despite her qualifications she was rejected; and

(c) that tenure positions in the Marketing Area at the Business School were open at the time she was denied tenure, in the sense that others were granted tenure in the Area during a period relatively near to the time she was denied tenure.

*See Banerjee v. Board of Trustees*, 648 F.2d 61, 62–63 (1st Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

■ If the plaintiff succeeds in making out her prima facie case, the burden of production then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the decision to deny tenure to the plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Banerjee*, 648 F.2d at 63. The defendant needs only "to *articulate*, not prove, a non-discriminatory reason for its action." *Menard v. First Sec. Servs. Corp.*, 848 F.2d 281, 285 (1st Cir.1988) (emphasis in original); *accord Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 108 (1st Cir.1988); *see Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam).

■ Finally, if the defendant successfully comes forward with a nondiscriminatory reason for the tenure denial, the burden shifts back to the plaintiff to show that the articulated nondiscriminatory reason was a pretext for sex discrimination. *Burdine*, 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095. The plaintiff can establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. However, a plaintiff

> cannot meet his burden of proving "pretext" simply by refuting or questioning the defendants' articulated reason.
>
> Merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent, for "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons" in the first place. To hold otherwise would impose an almost impossible burden of proving "absence of discriminatory motive."

*Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987) (citation omitted) (quoting *White v. Vathally*, 732 F.2d 1037, 1042–43 (1st Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984) (quoting *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1094)).[2]

■ Under the conventional three-step *Burdine* framework outlined, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. However, there is one type of Title VII case in which the conventional *Burdine* framework is modified, and in which the ultimate burden does shift to the defendant: in a "mixed

---

would be made. That is, [she] need show only that [her] qualifications were at least sufficient to place [her] in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body'." *Banerjee v. Board of Trustees*, 648 F.2d 61, 62–63 (1st Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981) (quoting opinion below, 495 F.Supp. 1148, 1155–56 (D.Mass.1980)); *see also Fields*, 817 F.2d at 934.

2. *Dea* involved the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, originally passed in 1967, which largely tracks Title VII. Precedents interpreting the ADEA are, therefore, a helpful guide to the interpretation of Title VII. "[I]n cases brought under ... the [ADEA], ... courts borrow the Title VII order of proof for the conduct of jury trials." *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 1812, 104 L.Ed.2d 268 (1989) (Kennedy, J., dissenting); *see Fields*, 817 F.2d at 934 n. 1 ("[T]he *McDonnell Douglas* test is followed to the same extent under [the ADEA] as under [Title VII]."); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (holding an interpretation of Title VII applicable "with equal force in the context of age discrimination, for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII'") (quoting *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)).

motive" case, one in which the plaintiff is able to prove that the employer's decision was motivated in part by illegitimate factors, the employer can escape liability only "if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person." *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989) (Brennan, J., plurality opinion). A plaintiff can prove illegitimate motivation, and thus push her case into the *Price Waterhouse* framework, by offering "direct evidence" of discrimination. *See id.* 109 S.Ct. at 1801–06 (O'Connor, J., concurring); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121–22, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Fields,* 817 F.2d at 935; *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 69 n. 6 (1st Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).[3]

Of course, as the First Circuit has recognized,

> [i]n a discriminatory discharge case, it is likely that a plaintiff could seldom uncover direct proof that his employer fired him solely for [an impermissible reason].... [A] plaintiff in a case like this will rarely, if ever, be able to produce a "smoking gun" that provides direct, subjective evidence of an employer's [discriminatory] intent.

*Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 929 (1st Cir. 1983) (discussing the Railway Labor Act, 45 U.S.C. § 152 Fourth); *accord Hallquist v. Local 276, Plumbers and Pipefitters Union,* 843 F.2d 18, 24 (1st Cir.1988) ("[W]e have always recognized that 'direct' evidence of discrimination is elusive in Title VII cases."). "Particularly in a college or university setting, where the level of so-

phistication is likely to be much higher than in other employment situations, direct evidence of sex discrimination will rarely be available." *Sweeney v. Board of Trustees,* 569 F.2d 169, 175 (1st Cir.), *vacated on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam).

■ Another implication of this higher level of sophistication is that when the plaintiff's quondam employer is an academic institution, assessment of the proof of causation is an undertaking of considerable subtlety. The assessment therefore requires special sensitivity to the limits of the Title VII court's writ:

> [T]he district court ... is [not] empowered to sit as a super tenure board.... [C]ourts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement. Absent discrimination, a university must be given a free hand in making such tenure decisions. Where ... the university's judgment is supportable and the evidence of discrimination negligible, a federal court should not substitute its judgment for that of the university....
>
> ....
>
> ... Inevitably, some tenure decisions ... will be very close—may, indeed, split the university community and lead responsible people to very different conclusions on the merits. Courts have no license to resolve such disputes except where there is evidence from which to conclude that an illicit motive was at

---

**3.** For examples of items that courts have regarded as "direct evidence" of discriminatory intent, see *Fields,* 817 F.2d at 933, 935 (statement to plaintiff by associate professor that rejecting his advances " 'was no way to get tenure' "); *Thurston,* 469 U.S. at 121, 105 S.Ct. at 621–22 (age-based transfer policy); *Blalock v. Metal Trades, Inc.,* 775 F.2d 703, 707–09 (6th Cir.1985) (acknowledgement by agent of defendant that plaintiff's religion played a role in his discharge); *Miles v. M.N.C. Corp.,* 750 F.2d 867,

873–74 (11th Cir.1985) (statement by person in charge of hiring for defendant that he did not hire blacks because " '[h]alf of them weren't worth a shit' "); *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1553–57 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) ("sexist statement" by selecting supervisor "that he would not put [plaintiff] in the washroom because if he did, 'every woman in the plant would want to go into the washroom' ").

work. The fact that a court might be sympathetic to a tenure award is not enough from which to find discrimination unless the University's stated reasons are palpably unworthy of credence or there is other evidence pointing to discrimination.

*Kumar v. Board of Trustees*, 774 F.2d 1, 12 (1st Cir.1985) (Campbell, C.J., concurring), *cert. denied*, 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). Thus, it was error to have "treated Title VII of the Civil Rights Act of 1964 as though it were an affirmative action statute, and so proceeded on the theory that once a candidate was 'qualified' under the standards of the university, it would be pretextual for the university's administrator not to appoint him." *Id.* at 10–11 (Wyzanski, D.J.).

> Indeed, courts must recognize the importance of allowing universities to run their own affairs (and to make their own mistakes). To do otherwise threatens the diversity of thought, speech, teaching, and research both within and among universities upon which free academic life depends. *Cf. Board of Curators v. Horowitz*, 435 U.S. 78, 87–91 [, 98 S.Ct. 948, 953–56, 55 L.Ed.2d 124] (1978) (counseling discretion in judicial interference in academic decisionmaking).

*Vargas–Figueroa v. Saldana*, 826 F.2d 160, 162–63 (1st Cir.1987). [A tenure decision of a college or university "is entitled to stand even if it appears to have been misguided, unless it was sex biased [or based on other prohibited motives]." ) *Sweeney v. Board of Trustees*, 604 F.2d 106, 112 (1st Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

Finally, more subjectivity is permitted with respect to academic tenure decisions than might be tolerated in other Title VII settings. This is because of

> the difference between the selection of a craftsman and of a professional. A bricklayer who can properly lay a specified number of bricks in a specified period is ordinarily as good as any other bricklayer likely to appear. But in the selection of a professor, ... while there

may be appropriate minimum standards, the selector has a right to seek distinction beyond the minimum indispensable qualities.

*Kumar*, 774 F.2d at 11 (Wyzanski, D.J.). In short, the elasticity of promotion standards for teachers in an academic setting does not constitute, in and of itself, evidence of discrimination. *Cf. Watson v. Fort Worth Bank and Trust*, —— U.S. ——, 108 S.Ct. 2777, 2791, 101 L.Ed.2d 827 (1988) (plurality opinion) (" '[The] criteria [used by a university to award tenure], however difficult to apply and however much disagreement they generate in particular cases, are job related.... It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review'.") (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2d Cir.1984)).

## III.

### MISSING EVIDENCE

Given the great subtlety and sensitivity required in assessing the evidence in this action, I am compelled to begin the detailed findings and conclusions by evaluating in depth the lack of certain evidence which might have been relevant and material to a determination of this case. Full development of the record has been hampered by what I shall call the problem of missing evidence, caused jointly and severally by the application of what I have now concluded was an erroneous extension of evidentiary privilege to the defendants, by the negligence of the defendants in preserving documents, by the inattentiveness of the defendants to their discovery responsibilities, and, ultimately, by the strategic judgment of the plaintiff herself not to pursue further discovery when it was offered her by the court.

The plaintiff sought to short circuit the judgment process and obtain the benefit of certain adverse inferences and preclusionary orders as a result of the missing evidence. She was, however, unwilling to accept an offer to conduct further discovery

in order to remedy the advantage that she contended defendants had previously obtained improperly from the privilege, the documentary destruction, and the discovery defaults. For my part, I have been unwilling to decide this case on the basis of evidentiary constructs such as adverse inferences and preclusionary orders.

In this section, I make findings and draw conclusions regarding the various aspects of the problem of missing evidence. I first consider the limitations created for plaintiff in her development of proof and then address the remedies for those limitations.

### A. The Evidentiary Limitations

#### 1. The Erroneous Privilege

■ This case was assigned to me when I joined the court. A certain amount of discovery had been conducted, and Magistrate Cohen and Judge Garrity, to whom the case was previously assigned, had made a number of legal determinations. One of these determinations resulted in the recognition of a "qualified academic privilege against disclosure" of the identities of faculty and peer reviewers who furnished evaluations to the Business School in the tenure review process. *Jackson v. Harvard Univ.*, 111 F.R.D. 472, 474 (D.Mass. 1986).

In keeping with my practice of continuing to apply the law previously applied by other judicial officers in those ongoing cases for which I assumed responsibility—and despite significant reservations—I attempted to apply the privilege to discovery and trial of this case. In the course of discovery, however, the strictures of the privilege were modified somewhat.

For example, I concluded that the privilege was jointly held both by each individual reviewer and by Harvard as the academic institution. Thus, if deposed or called to testify, an individual reviewer was free to choose to disclose his or her own views as communicated in the review process. The reviewer was not free, absent

Harvard's assent, to identify the individual views of others. Further, the parties were permitted to inquire into the range of expressed views—without identifying by name the reviewers or commentators—through protocols for distinguishing among reviewers and commentators by the use of letters, e.g., Reviewer A and Committee Member D, rather than specific names.[4]

In fashioning a privilege for evaluators in the tenure process, Judge Garrity relied upon *EEOC v. University of Notre Dame du Lac*, 715 F.2d 331 (7th Cir.1983), in which the Seventh Circuit held that universities may redact any "identifying features" of peer reviewers before turning files over. *Id.* at 337–38. Under *Notre Dame du Lac*, in order to obtain more information, a plaintiff must

> make a substantial showing of "particularized need" for relevant information, a burden similar to that imposed on a party seeking disclosure of grand jury materials.
>
> ... [T]he mere fact that certain information may be relevant or useful does not establish a "particularized need" for disclosure of information. The party seeking disclosure of the privileged information must show a "compelling necessity" for the *specific* information requested.

*Id.* at 338 (emphasis in original) (citations omitted). Academic privilege is needed, in the Seventh Circuit's view, because

> confidentiality is absolutely essential to the proper functioning of the faculty tenure review process. The tenure review process requires that written and oral evaluations submitted by academicians be completely candid, critical, objective and thorough.... Without [the] assurance of confidentiality, academicians will be reluctant to offer candid and frank evaluations in the future.

*Id.* at 336.

A number of other courts have not gone so far as to establish a rule of academic

---

**4.** The specific names of tenure candidates other than Ms. Jackson were similarly protected. Thus other tenure candidates were identified by year of tenure consideration and by a number; e.g., Candidate 81–1 would be one of several candidates considered in 1981. The named identities of the tenure candidates were masked in this fashion not as a result of privilege considerations but rather in an effort to minimize intrusions upon their privacy.

privilege, but have fashioned instead a balancing approach. In *Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977), the Fourth Circuit upheld, as an appropriate exercise of discretion under Fed.R.Civ.P. 26(c), a lower court's refusal—based on a balancing of the interest of the college in confidentiality against the need of the plaintiff for the material—to order disclosure of confidential evaluations of faculty members. *Id.* at 581.

Without reference to Rule 26, the Second Circuit employed a similar balancing approach before allowing discovery of how members of a tenure committee voted. *Gray v. Board of Higher Educ.,* 692 F.2d 901 (2d Cir.1982). The Second Circuit noted that the dangers of compelling disclosure are that "candid peer evaluation will be chilled, the harmony of faculty relations will be disturbed, and academic freedom will be threatened by government intrusion into the life of colleges and universities." *Id.* at 907. However, because the plaintiff was not given a " 'meaningful written statement of reasons' " for his rejection, *id.* (quoting brief of American Association of University Professors), "the balance tips toward discovery and away from recognition of privilege," *id.* at 908. District courts in the Ninth Circuit have followed these precedents, *see, e.g., Rubin v. Regents of Univ. of Cal.,* 114 F.R.D. 1, 2–4 (N.D.Cal.1986), as has one in the Sixth Circuit, *see Parvarandeh v. Goins,* 124 F.R.D. 169, 170–73 (Mag.E.D.Tenn.1988), *aff'd,* 124 F.R.D. 173 (E.D.Tenn.1989). *But see Wright v. Jeep Corp.,* 547 F.Supp. 871, 875 (E.D.Mich.1982) (refusing to recognize academic privilege asserted by professor fighting subpoena of research notes by defendant in tort litigation).

Two circuits have ruled that tenure discussions, votes, and files are in no way privileged and hence fully discoverable. In *In re Dinnan,* 661 F.2d 426 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982), the court rejected arguments that the privilege was necessary to protect the societal interests of academic freedom and the secret ballot, finding "neither argument to be even slightly persuasive." *Id.* at 430. The Third Circuit, in *EEOC v. Franklin and Marshall College,* 775 F.2d 110 (3d Cir. 1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986), was more sympathetic to the arguments in favor of the privilege, but nonetheless rejected them:

> A privilege or Second Circuit balancing approach which permits colleges and universities to avoid a thorough investigation would allow the institutions to hide evidence of discrimination behind a wall of secrecy.
>
> ... In the face of the clear mandate from Congress which identified and recognized the threat of unchecked discrimination in education, ... we have no choice but to trust that the honesty and integrity of the tenured reviewers in evaluating decisions will overcome feelings of discomfort and embarrassment and will outlast the demise of absolute confidentiality.

*Id.* at 115 (referring to Title VII). District courts in the Eighth Circuit have followed these precedents. *See Orbovich v. Macalester College,* 119 F.R.D. 411, 413–15 (Mag. D.Minn.1988); *Rollins v. Farris,* 108 F.R.D. 714 (E.D.Ark.1985).

I find the arguments against recognizing any form of academic privilege compelling. As a preliminary matter, the burden on the proponent of a new privilege is very high. In declining to create a new privilege for the President of the United States, the Supreme Court noted that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (footnote omitted). In a more domestic setting, the Court summed up its approach to privileges as follows:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public ... has a right to every man's evidence'." As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or

excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."
*Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (citations omitted). Thus, academic privilege is defensible only if it serves some transcendent public good.

I am satisfied it does not. In fact, the opposite is true: when discrimination by an academic institution is alleged, the public good is best served by a thorough examination of the factors that influenced the disputed decision. If society perceives that a *teacher* has been the victim of discrimination, it can have no confidence that students will be allowed to succeed to the ultimate limits of their potential. The possibility that a qualified applicant will be rejected on other than academic grounds "is a much greater threat to our liberty and academic freedom than the compulsion of discovery." *Dinnan,* 661 F.2d at 431.

Moreover, it is difficult to see why a university should be entitled to a privilege to which other institutions are not. Presumably, candor and harmony are values desired by professional partnerships. Yet, if a law firm, *see Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), or an accounting firm, *see Price Waterhouse,* 109 S.Ct. 1775, is charged with having refused to advance an individual on grounds that society has deemed impermissible, it is not permitted to shield from discovery the reasons for the decision or the identity of the assessors. Indeed, the importance of vindicating fair employment rights has been viewed as sufficient to overcome the traditional absolute immunity attaching to the decisions of judges made in the course of their work. *See Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Why, then, should Harvard University be allowed to shield the identities of evaluators and the content of critical discussions which influence tenure and promotion decisions?

It is no answer that disclosure will chill frank evaluations of a teacher's merit. If anything, because members of tenure committees and peer reviewers themselves have tenure—or are otherwise substantial figures—they have less to fear from disclosure of their votes or evaluations than do those making employment decisions in other fields which have no claim to such a neo-privilege. In addition, the prospect of scrutiny can be expected to impress upon evaluators their duty to be prepared to offer defensible reasons for their judgments. A faculty member whose vote resulted from a reasoned assessment of an applicant's record, or a peer evaluator whose critique of a candidate's work is supported by scholarly analysis, has nothing to fear—except perhaps the disappointment of the subject and her supporters—from the disclosure of her vote or evaluation. It is only if improper considerations affected her decision that an evaluator need fear public scrutiny. That is a tolerable price to pay for any loss of faculty harmony. As Justice Brandeis observed in a different context, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." L. Brandeis, *Other People's Money* 62 (Nat'l Home Lib. Found. ed. 1933).

Nor will academic freedom be imperiled by judicial refusal to recognize academic privilege. Academic freedom requires two conditions: that a university be free " 'to determine for itself on academic grounds who may teach'," *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (citation omitted) (Frankfurter, J., concurring), and that there be no "governmental intervention in the intellectual life of a university," *id.* at 262, 77 S.Ct. at 1217–18. When a member of the university community alleges that the institution has violated the ground rules under which all employers must operate as employers, it is not inconsistent with principles of academic freedom for an impartial third party, the legal system, to settle the dispute—not by imposing selection criteria of its own, but by assessing whether the employment decision was made according to academia's own standards, free of impermissible nonacademic considerations.

The courts do not "reevaluate a candidate's qualifications," but rather leave tenure and promotion decisions "exclusively to this nation's colleges and universities so long as the decisions are not made, in part large or small, upon statutorily impermissible reasons." *Franklin and Marshall*, 775 F.2d at 117; *see also Rollins*, 108 F.R.D. at 719 ("Academic freedom in employment actions extends only insofar as legitimate, academic grounds form the basis of tenure decisions."). And only with access to all relevant information can a fact finder determine whether a university's decision in a particular case was based on academic considerations or discriminatory factors.

Finally, there is no reason why, upon a proper showing by the party opposing disclosure, confidential records cannot be produced subject to appropriate protective orders, forbidding further disclosure and permitting their use only by the litigants for the purposes of the litigation. A protective order can safeguard the confidentiality of the materials to the extent consistent with a fair hearing of the allegations of the plaintiff.

In sum, there are understandable reasons why academic institutions—indeed all professional groups [5]—strive to maintain the general confidentiality of tenure votes and peer reviews. The university's desire to protect the confidentiality of its evaluation procedures, however, cannot transcend the need to have all relevant information available to a plaintiff alleging a violation of federal anti-discrimination law. The normal mechanisms of discovery are tools well-suited for a court's use in striking a fair balance between these competing interests. That balance should not be thrown out of alignment by overemphasis upon the concerns of academics that their decision-making process has some special claim to be conducted in secrecy.

### 2. The Destruction of Documents

When the plaintiff commenced this action, she served defendants with her First Request for Production of Documents. This included a request for the tenure files of every male who had ever been granted tenure at the Business School. On March 5, 1986, the Magistrate ordered that plaintiff be allowed discovery of the files of successful male candidates for tenure during only the 1981–1984 period. Plaintiff appealed the narrow scope of the Magistrate's ruling, and on August 12, 1986, Judge Garrity "modifie[d] the magistrate's order to permit discovery of the tenure files of men who were granted tenure between 1974 and 1984." *Jackson*, 111 F.R.D. at 476.

After Judge Garrity's August 1986 ruling, plaintiff and the court learned that defendants would not be able to comply fully with the Judge's discovery order, because the majority of the requested tenure files had been destroyed in April or May of 1986, shortly after issuance of the Magistrate's order.

The destruction of documents can merit the inference that the contents of the destroyed documents were unfavorable to the party that destroyed them. The First Circuit has observed that:

> The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case,

---

5. The periodic claims of various professional groups for recognition of an evidentiary privilege concerning their professional communications and papers, *cf. United States v. Arthur Young & Co.*, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), appear in part motivated by a desire to achieve enhanced professional status. If, as Shaw contended, "all professions ... are ... conspiracies against the laity," G.B. Shaw, *Preface* to *The Doctor's Dilemma: A Tragedy* (1906), in XII *Ayot St. Lawrence Edition of the Collected Works of Bernard Shaw* 11 (1930), there is no better way to further the ends of the conspiracy than to shroud its communications in secrecy. But an evidentiary privilege is not a badge of professional distinction; it is—or should be—a highly functional and strictly limited device for advancing some particular professional role as to which society is willing to pay the severe cost of being deprived of relevant evidence when communications and documents concerning that role are put in issue. Nothing in the nature of academic tenure decision making supports a determination to pay such a cost in anti-discrimination proceedings.

the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him. Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists:

> The failure or refusal to produce a relevant document, or the destruction of it, is evidence *from which alone* its contents may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.

2 *Wigmore on Evidence* § 291, at 288 (Chadbourn rev.1979) (emphasis added). The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them.

*Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir.1982); *see also Petition of United States*, 255 F.Supp. 737, 740 n. * (D.Mass. 1966), *aff'd in pertinent part and rev'd in part sub nom. United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 196 (1st Cir.), *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967). Consequently, it is necessary for me to evaluate in detail the circumstances of Harvard's destruction of documents in order to evaluate what inferences, if any, should be drawn.

At the time this litigation commenced, the subject tenure files were stored in the office of Marrilyn Reid, the Administrator for Faculty Appointments and Procedures and Secretary of the Faculty of the Harvard Business School.[6] The files remained in Ms. Reid's office until September 1985, at which time they were sent to the Inactive Records Center of Harvard University. Ms. Reid was "well aware" at the time the files were sent that they were needed for this litigation; she had been advised that the tenure files were to be preserved. However, she desperately needed to create file space in her office, and she believed the tenure files would be safe at the Inactive Records Center.

In selecting the particular files to be sent, Ms. Reid consulted with Amy Sugerman, who had become the Business School's Records Analyst in August 1985. The two women worked with one another in the selection process, but they did not communicate with respect to the various special considerations involved in the transfer. When the transfer was made, I find, Ms. Sugerman did not know about the pendency of this litigation or plaintiff's discovery request: she thought the tenure files were being transferred to be destroyed. Consequently, she filled out a "Records Disposition Application and Certificate" for the destruction of the files and sent it to the appropriate administrator at the Business School.[7]

Ms. Sugerman also told Joan Glasser, the staff assistant to Richard Haas, the Records Management Officer of Harvard University's archives, that the files were to be destroyed. In fact, during September–October 1985, Ms. Sugerman and Ms. Glasser spoke between ten and twenty times.

---

**6.** Ms. Reid's duties included preparing the vitae of the candidates, typing the subcommittee reports, monitoring the faculty reading of the reports, and writing the promotion letters for successful candidates.

**7.** The Disposition Application filled out by Ms. Sugerman is a form—actually two forms—which, pursuant to a policy adopted by the Harvard Corporation in 1939, must be completed before any Business School or other University records may be destroyed. Completion of the Application requires the signatures of four persons: (1) the chairman of the applicable department; (2) the Business School, or other appropriate, librarian; (3) the Secretary of the Harvard Corporation; and (4) the Director of the University's library. There is no evidence that the Application filled out by Ms. Sugerman was ever signed by any of the requisite four persons. The form itself was either lost or destroyed. In any event, it was never produced during discovery, and was not introduced into evidence during the trial.

These conversations left Ms. Glasser with "no doubt" whatsoever that the records received from the Business School in September were to be destroyed.

When the tenure records arrived at the Inactive Records Center in September, they were placed in the area reserved for materials that are to be incinerated. Normally, records are not received and placed in that area unless they arrive with a completed Disposition Application. According to Mr. Haas, these records were received as an exception to the general rule because he was doing a favor for Ms. Sugerman and because he fully believed that the completed Application would be forthcoming.

On December 9, 1985, Ms. Sugerman received a memorandum from Dean Currie, the Business School's Assistant Dean for Administration and Policy Planning. This memorandum informed Ms. Sugerman, apparently for the first time, that the Business School was "in the early stages of litigation with someone who failed to be promoted to tenure. [And that] [f]or the time being, and especially now when we are in the 'discovery' process, our attorneys say that we shouldn't throw anything away." Ms. Sugerman sent a copy of Dean Currie's memorandum to Rick Haas and Marrilyn Reid two days after she received it.

On December 16, 1985, Rick Haas sent a memorandum to Ms. Sugerman in which he acknowledged his agreement with the directive expressed in Dean Currie's memorandum. Two days later, Ms. Sugerman called Mr. Haas to make sure that the tenure records which had been sent to the Inactive Records Center in September would not be accidentally destroyed. She memorialized her telephone conversation with a handwritten note to herself at the bottom of Mr. Haas's December 16th memorandum. This note states:

Called Rick 18 Dec asking him if the records for Marilyn now stored in the "hold" area for incineration would be safe there and wouldn't be destroyed ac-cidentally with the Admissions files which were moved to the hold area at the same time. He said "absolutely not"—that he personally lets the movers in and supervises them as to which boxes to take.

Mr. Haas claims that following his conversation with Ms. Sugerman, he informed Ms. Glasser of the necessity of preserving the Business School's tenure records. He did not, however, write any sort of note or memorandum to this effect, and Ms. Glasser vehemently denies that she was ever told that the subject tenure records had to be preserved. Moreover, no one associated with the Inactive Records Center ever followed the Center's routine procedure of recording the subject tenure records on the "shelf list" of records to be preserved.

In late April or early May of 1986, a moving company employed by Harvard University to transport documents for purposes of destruction removed the boxes containing the subject tenure records from the Inactive Records Center. Ms. Glasser supervised the removal of the boxes, having been directed by Mr. Haas to let the movers take every box in the area of the Center where the tenure records had been stored since September.

The records were removed and destroyed without a Disposition Application ever having been presented to the Inactive Records Center. They appear to have been the first Business School records ever removed from the Inactive Records Center. They were apparently the only records of any sort to have been destroyed without a completed Disposition Application since the advent of the 1939 University-wide policy regarding records retention.

### 3. The Defaults and Delays in Discovery

Plaintiff first became aware of the existence of highly material documentary evidence concerning the rapid evaporation of support for her 1981 tenure candidacy near the end of trial—three and one-half years after the commencement of the litigation.[8]

---

8. This disclosure came during the cross-examination of Dean Gordon Donaldson after in-quiries from me concerning relevant records.

The evidence was in the form of a tally sheet which set forth the actual results of the two 1981 votes on her candidacy.

The late arrival in the case of the tally sheet and the obviously relevant information contained on it was not the fault of plaintiff. Plaintiff had made a timely discovery request to which production of the tally sheet would have been responsive. Not only did defendants fail to turn over the tally sheet during discovery, but defendants' counsel misled the court, during a hearing held on February 17, 1988 to consider defendants' motion for summary judgment, by representing that all tenure "ballots are routinely destroyed after the vote is taken."

Moreover, a full month after the culmination of the trial, defendants' counsel stated in a submission to the court that "[i]n reviewing why the 1981 tally sheet was not produced earlier, and in an effort to make certain that all responsive documents had been produced, a broader review was made over the last two days. In the course of this review other papers have been identified which were responsive to plaintiff's discovery requests and were not previously produced to plaintiff." After receiving these "other papers," plaintiff moved to reopen the evidence. I granted that motion. Thereafter, certain additional documents were submitted in evidence by agreement of the parties. Thus, as a result of defendants' neglect in complying with their discovery obligations, plaintiff was prejudiced in the development of her pre-trial strategy and the resolution of this case was unnecessarily delayed.

### B. *Remedies for the Limitations*

Immediately after plaintiff became aware of defendants' discovery violations (and before she had obtained a copy of the tally sheet), she moved, pursuant to Fed.R. Civ.P. 26(g), 37(b), and 37(d), for sanctions. She requested that the defendants be precluded from offering any evidence concerning the votes of the tenured faculty in 1981 and 1983. This request was the culmination of plaintiff's efforts to obtain the benefit of affirmative evidentiary sanctions such as adverse inferences and preclusion

orders to overcome the effect of the evidentiary suppression caused by the erroneous privilege, documentary destruction, and discovery delay. My legal analysis of adverse inference sanctions and preclusionary remedies is set forth below in Sections III.B.1. and III.B.2., respectively.

Instead of employing adverse inferences or preclusionary orders, I offered to remedy Harvard's negligent suppression of evidence by reopening discovery and allowing plaintiff to make further inquiry unconstrained by the limitations of an academic privilege. This offer provided plaintiff with the opportunity to develop for herself a remedial program closely tailored to meet the problems created by, for example, defendants' failure to disclose the tally sheet and other relevant information until the conclusion of trial in a four-year-old case. My offer, if accepted, could have made available to plaintiff—and the court—relevant evidence necessary to the determination of the ultimate issue in this case: whether defendants discriminated against plaintiff in denying her tenure. The plaintiff, however, rejected the offer and chose, as set forth more fully below in Section III.B.3., not to pursue further discovery.

There is no doubt that a major problem in this litigation has been the unavailability of relevant evidence, caused by the assertion of an unwarranted privilege, the destruction of relevant tenure records, and the belated and begrudging disclosure of critical ballot documents such as the tally sheet. As a policy matter, however, I rejected the adverse inference and preclusion remedies proposed by plaintiff because they would have exacerbated the underlying problem further. Such remedies would have continued to circumscribe unnecessarily the evidence available for my fact finding.

#### 1. The Adverse Inference Remedy for Document Destruction

■ Defendants offered two reasons why I should not draw an adverse inference from the destruction of documents:

(1) The files destroyed presumably included the tenure records of unsuccessful as well as successful male candidates. De-

fendants maintained that if the records of the unsuccessful males had been available, they would have shown that men were denied tenure on the same or similar grounds as plaintiff, and that the Business School's promotion standards were applied in a consistent, gender-blind manner. They contended that the destruction of the records therefore hurt their case as much as, if not more than, plaintiff's.

(2) The records were inadvertently destroyed after the Business School sent them out for safekeeping. Defendants averred there was no intent to destroy evidence, and in fact every intent to preserve it. They maintained that the loss of the evidence was due to errors made at the Inactive Records Center, whose manager, Mr. Haas, was not directly affiliated with the Business School, and who had assured the Business School that he would personally see to the security of the relevant documents; and whose negligence accordingly should not be imputed to defendants. Defendants contended they should not suffer the extraordinary consequence of having a significant evidentiary inference drawn against them because someone over whom they had little or no control made a mistake.

I found defendants' first argument meritless. Speculation that destroyed documents may have proven helpful to defendants is hardly a reason not to draw a negative inference from what was at best negligent behavior on defendants' part. While the records of unsuccessful male candidates could have aided defendants' case, they also could have damaged defendants' case, for instance, by showing that those men were denied tenure only because their records were substantially poorer than plaintiff's. The point is that we do not know what those documents would have shown. We are left with speculation, attributable to defendants' failure to do what they should have done.

However, defendants' failure was not intentional. And for that reason, I found compelling defendants' second ground for opposing the negative inference. Although there was initial confusion as to whether the subject tenure records were sent to the Inactive Records Center for preservation or for destruction, long before the actual destruction of the records that confusion had been cleared up.

Dean Currie specifically notified Amy Sugerman in December 1985 that the subject records were to be preserved. Amy Sugerman in turn passed this information on to Richard Haas, who gave her absolute assurance that the records would not be destroyed. Thus, five to six months before the records were actually destroyed, defendants had taken some precautions to make sure the records would be protected. Of course, in retrospect it is obvious that the precautions were inadequate and that the Business School should have done more to protect the records. Ms. Sugerman should, for instance, have requested that Mr. Haas immediately transfer the records to the General Counsel's Office of the University. However, I refused to penalize defendants for having failed to take the most prudent course. Defendants were negligent, but they did not act in bad faith: they did not intentionally have the documents destroyed.

First Circuit case law suggests that my authority to draw a negative inference against defendants is not wholly dependent upon a finding of bad faith. Under the principle adopted by the First Circuit in *Nation–Wide Check*, I "*may* receive the fact of the document[s'] ... destruction as evidence that [defendants] fear[ed] that the contents would harm [them]," 692 F.2d at 217 (emphasis supplied), apparently regardless of whether defendants acted in good or bad faith. However, I am not obliged to draw that inference, and here I chose to exercise my discretion by not drawing it.

I would, no doubt, have reached a different conclusion if plaintiff had produced any evidence showing that defendants destroyed the subject records to avoid disclosure in this litigation. However, the drawing of a negative inference under the circumstances of this case, an act which would be all but a declaration of victory for plaintiff, is unwarranted. Here, the evidence shows merely that a person—Rich-

ard Haas—who was not under the direct supervision or control of the Business School, made a mistake. To impute his error to Business School decision makers and declare that, as a result of it, defendants must set aside by default a tenure decision that was reached over painstaking hours by the tenured Business School faculty, would be an unduly harsh remedy. It is one I have chosen not to impose. *See Allen Pen Co. v. Springfield Photo Mount Co.,* 653 F.2d 17, 23–24 (1st Cir.1981) (Plaintiff "has not shown that the document destruction was in bad faith or flowed from the consciousness of a weak case. There is no evidence that [defendant] believed the [destroyed pieces of evidence] would have damaged it in a lawsuit. Without some such evidence, ordinarily no adverse inference is drawn from [defendant's] failure to preserve them."); *Eaton Corp. v. Appliance Valves Corp.,* 790 F.2d 874, 878 (Fed. Cir.1986) ("If a court finds that both conditions precedent, evidence destruction and bad faith, are met, it may then infer that the evidence would be unfavorable to the destroying party if introduced in court."); *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985) ("The prevailing rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for the destruction. . . . [The facts of this case] suggest that the documents were destroyed under routine procedures, not in bad faith, and thus cannot sustain the inference that defendants' agents were conscious of a weak case.") (citations omitted); *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.,* 695 F.2d 253, 258–59 (7th Cir. 1982) (Before a court may draw a negative inference from a party's destruction of evidence, it must be convinced "that the party did so in bad faith.") (citing *Commercial Ins. Co. v. Gonzalez,* 512 F.2d 1307, 1314 (1st Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (1975)).

When Harley Holden, the Curator of the Harvard University Archives, learned of the destruction of the subject tenure records, he told Mr. Haas, "It's a terrible mistake and it should not have happened." Mr. Holden was correct. However, I find that although "terrible," the destruction of the tenure records was in fact a mistake. It was not a purposeful or intentional act on the part of the defendants designed to suppress evidence. I find that it is more likely than not that the records were destroyed because of miscommunication between Mr. Haas and Ms. Glasser, and because the records were stored at the Inactive Records Center directly adjacent to boxes containing material for which Disposition Applications had been properly completed. For this the sanction of adverse inference would be disproportionate.

### 2. The Preclusionary Remedy for Discovery Default

■ Faced with the belated discovery of documents concerning the ballots on her tenure candidacy, plaintiff requested that I punish defendants for their discovery default by precluding them from offering any evidence concerning the votes of the tenured faculty in 1981 and 1983.

An order "prohibiting [a disobedient] party from introducing designated matters in evidence" is, of course, one of the sanctions available to a court faced with violation of its discovery orders. Fed.R.Civ.P. 37(b)(2)(B). However, although "[t]he district court has considerable discretion in policing alleged discovery transgressions[,] . . . preclusion is a grave step, and by no means an automatic response to a delayed disclosure." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1341 (1st Cir.1988).

The *Freeman* court cited a Ninth Circuit precedent for the proposition that an "order excluding evidence should not be imposed where failure to make discovery [is] not willful." *Id.* (citing *United States v. Sumitomo Marine & Fire Ins. Co.,* 617 F.2d 1365, 1369 (9th Cir.1980)); *cf. National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam) (a district court may resort to the extreme sanction of dismissal for discovery violations attributable to "flagrant bad faith" and "callous disregard" of responsibilities). Although the question is a close one, I have conclud-

ed that defendants' default here resulted not from willfulness but rather from negligence occasioned by the push and shove which documentary production in this case entailed. To be sure, the documents were the subject of an appropriate demand; the demand, however, was resisted verbally and the plaintiff did not follow up with a request for specific court action. I do not underplay the misleading character of defendants' responses to plaintiff and the court, but, on balance, I believe that more foundation would have had to have been laid to show bad faith or willfulness here. I therefore exercised my "discretion *not* to impose sanctions." *Benitez–Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 33 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989) (emphasis in original).[9]

### 3. The Plaintiff's Failure to Pursue Evidence

■ Plaintiff gave four reasons for her refusal to take advantage of the remedial opportunity I afforded her to pierce the academic privilege and pursue further evidence. She contended that: (1) After four years of litigation she was emotionally and financially spent, and felt unable to bear the additional burden that the further imposition of discovery would have imposed; (2) Defendants were at fault for the late arrival of the documents and the burden should be on them to explain the dramatic swing in Ms. Jackson's support—to the extent defendants failed to carry this burden, negative inferences should be drawn against them; (3) Under a cost-benefit analysis, it would be highly unlikely, especially given defendants' knowledge of plaintiff's theory of the case, that anything definitive would turn up if further discovery were undertaken; and (4) Piercing the academic privilege would provide defendants with an appellate issue, collateral to the merits, that would be time consuming and would deflect attention from the heart of the case.

Although I understood plaintiff's analysis, I did not find that by rejecting the opportunity to pursue evidence plaintiff had entitled herself to either an adverse inference or a preclusionary sanction. Plaintiffs who take on large, well-endowed institutions are on notice that heavy emotional and financial costs are likely in the litigation, *see generally* G. LaNoue & B. Lee, *Academics in Court—The Consequences of Faculty Discrimination Litigation* (1987), and that the only thing predictable about litigation is that it will take unpredictable and time-consuming twists and turns. At every stage in the process, litigants must perform cost-benefit analyses and bear responsibility for the consequences of their decisions. The judgment by plaintiff here that piercing the academic privilege would *not* prove beneficial was a considered decision, but it was not a decision for which plaintiff could claim a favorable evidentiary construct as second prize.

Defendants were at fault for the conduct of their discovery responsibilities. They deserved to be sanctioned for this behavior. However, the sanction needed to be one appropriate to the truth-finding process, not one that turned upon the emotional and financial convenience of the plaintiff and served only further to suppress evidence. I offered an appropriate sanction and the plaintiff rejected it.

The defendants' obliviousness to discovery obligations should not have required them to carry the burden, for example, of explaining why plaintiff lost so much support over a 25–day period in November and December 1981. Such a sanction would have radically transformed the burdens in this case. The defendants' burden was to articulate a legitimate, nondiscriminatory reason for having denied plaintiff tenure. Plaintiff's burden was to prove that she was denied tenure because of her gender. That burden ordinarily never shifts to defendant and the failures of discovery in this case did not justify shifting it.

The explanation of why plaintiff's support dissipated between the two meetings of the Full Committee in 1981 may well have been relevant to the ultimate factual

9. I have, however, by endorsement on the motion, allowed so much of the plaintiff's request for sanctions as sought attorneys' fees and costs in the amount of $935.00.

issue of whether defendants discriminated against plaintiff because of her gender. However, the mere fact of the dramatic dissipation tells me nothing one way or the other with respect to this issue. It was plaintiff's burden to establish the link between the dissipation and sex discrimination, and it was a burden plaintiff decided not to shoulder by conducting further discovery.

Despite the late date of my offer, therefore, I find that plaintiff was afforded a full and fair opportunity to conduct all appropriate discovery on the issues for which she bore the evidentiary burden. Plaintiff waived this opportunity.

I turn, now, to the facts established by the evidence actually adduced at trial.

## IV.

## FINDINGS REGARDING DIRECT EVIDENCE

### A. *The Plaintiff*

Barbara Jackson received her Ph.D. degree in applied mathematics from Harvard University in 1973. She joined the faculty of the Business School that year as an Assistant Professor of Business Administration. Her initial appointment was from March 1, 1973 until June 30, 1977. In 1977, she was promoted to Associate Professor and reappointed for a five-year term from July 1, 1977 to June 30, 1982.

During her first four years at the Business School, Ms. Jackson taught and conducted research in the Managerial Economics Area.[10] In 1977, she decided to change her field of specialization to Marketing, and over the course of the next two years, she gradually transferred into the Marketing Area. Broadly described, the move from Managerial Economics to Marketing was a move from theory to practice, from abstraction to application. It was a change

that many others on the Business School faculty had made before her; nonetheless, it was a change that Ms. Jackson undertook with some trepidation. She was concerned that the move would place her at a disadvantage when she came up for tenure review, because she would have had less time to demonstrate accomplishment and promise in her new field than would someone who had devoted his or her entire professional career to that field.

The administration of the Business School reassured Ms. Jackson that her tenure review would not be limited to her work in Marketing, but would include evaluation of her record as a whole. She was told that her work in Managerial Economics and the brevity of her exposure to Marketing would be taken into consideration in making her tenure decision. Thus reassured, Ms. Jackson completed the process of transferring to the Marketing Area in 1979. It was as a member of the Marketing Area that Ms. Jackson was reviewed for tenure in 1981 and then again in 1983.

### B. *The Business School's Tenure Review Process*

An individual's candidacy for tenure at the Business School is initially reviewed by a Subcommittee of four tenured professors appointed by the Dean. The candidate does not have control over which faculty members will or will not serve on his or her Subcommittee.[11] However, candidates are routinely afforded the opportunity to inform the Dean of the names of any persons they prefer not be on their Subcommittees, and the candidates' requests are routinely honored.[12]

The Subcommittee examines the candidate's entire academic record—including teaching, course development, and research—and solicits the confidential opinions of faculty members at the Business School, faculty at other institutions, and

---

**10.** "Area" is synonymous with "department."

**11.** Until 1982, the Dean appointed different subcommittees for each person who came up for tenure in a given year. Since 1982, the Dean has appointed a Standing Subcommittee, which evaluates all candidates in a given year.

**12.** Under the post–1982 "Standing Subcommittee" regime, the members of the Standing Subcommittee for a given year are announced before evaluations commence, and candidates are afforded the opportunity to object to individual members.

business practitioners, as appropriate. The Subcommittee measures the candidate's record of achievement and performance against the standards set forth in the Business School's "Policies and Procedures with Respect to Faculty Appointments and Promotions," and then writes a report of its findings. The Subcommittee's Report typically contains a recorded vote by Subcommittee members on whether the candidate has met the standards necessary for promotion with tenure, and whether the candidate should, in any event, be recommended for tenure.

The Subcommittee's Report is presented to the entire tenured faculty sitting as the Faculty Advisory Committee on Appointments ("Full Committee"). The Full Committee numbers 80 or more professors, of whom approximately 60–70 normally participate and vote. The candidate's Subcommittee Report is available to the Full Committee before, and is considered during, the deliberations of the Full Committee, along with individual faculty member opinions, assessments, and reflections about the candidate and his or her work. The Subcommittee Report plays a substantial role in framing the Full Committee's discussions, but it is not conclusive or dispositive. The recommendations of the Subcommittee may be disregarded by the Full Committee, and it is the Full Committee's vote that constitutes the faculty view concerning whether the candidate should receive tenure.

The Full Committee, with the Dean presiding, ordinarily meets twice to consider a candidate. During the first meeting, the Full Committee typically has a wide-ranging discussion of the candidate, followed by a preliminary vote in which the individual tenured faculty members vote by signed ballot. The Full Committee then adjourns and regathers within 30 days to have a second and final discussion about the candidate. At the end of this second meeting, the members once again vote by signed ballot.

The Full Committee vote is advisory in form. The Dean is not bound by the results, and it is the Dean who determines whether to recommend to the President and governing bodies of the University that a candidate receive tenure. In making his determination, the Dean accords considerable weight to the final vote of the Full Committee. In fact, never in the history of the Business School has a candidate received less than "substantial majority" support from the Full Committee and still been recommended for tenure by the Dean. Receipt of substantial majority support is not a guarantee that the Dean will recommend tenure, but failure to receive a substantial majority insures the denial of tenure. The Dean's decision whether or not to recommend appointment with tenure is *de facto* final. Harvard's President and governing bodies have never overridden a recommendation by the Dean of the Business School that a candidate be granted tenure; and when the Dean decides against recommending tenure, with rare exceptions, no further action is taken on the candidacy.

### C. The 1981 Tenure Review [13]

#### 1. The Subcommittee in 1981

■ Barbara Jackson first became eligible for tenure consideration in 1981. She

---

**13.** Defendants argue that the 1981 tenure denial, which occurred outside the 240–days limitations period, see *Johnson v. General Elec.,* 840 F.2d 132, 133 (1st Cir.1988), and was not mentioned in plaintiff's complaint, is not actionable. They concede the 1981 decision's relevance as " 'background evidence'." *Cajigas v. Banco de Ponce,* 741 F.2d 464, 470 n. 13 (1st Cir.1984) (quoting *United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)).

Defendants point to *Cajigas,* in which the First Circuit did not "rule squarely" on "whether the 'continuing violation' theory should operate to allow recovery with respect to a distinct act of discrimination taking place at an identifiable point of time outside the limitations period," but "at least one member of the panel doubt[ed]" whether it should. *Id.* (dicta) (footnote omitted). Although the First Circuit recently revisited the issue, holding that serial discriminatory acts constitute a continuing violation of Title VII if "they involve an interlinked succession of related events or a fully-integrated course of conduct," *Mack v. Great Atl. and Pac. Tea Co.,* 871 F.2d 179, 183 (1st Cir.1989), the court addressed the actionability of only the later acts, i.e., those occurring during the limitations period.

I find that the 1981 decision may be considered actionable here as part of a "continuing

submitted her portfolio in August 1981, and soon thereafter submitted a list of four faculty members whom she requested not be on the Subcommittee that would evaluate her work. She based her request on her impression that three of the four were biased against women and that the fourth was incompetent to judge her scholarship. Despite Ms. Jackson's request, Professor Stephen Bradley, one of the three persons she regarded as biased against women, was placed on her Subcommittee.

Ms. Jackson's Subcommittee met in the autumn of 1981 and prepared a Report on her candidacy. The Subcommittee members voted 3–1 that Ms. Jackson had met the standards necessary for promotion with tenure, and they voted 4–0 to recommend to the Full Committee that she receive tenure. Professor Bradley cast the lone vote against Ms. Jackson's qualifications, but recommended that she receive tenure as an exception to the Standards.

### 2. The 1977 Standards and the 1981 Standards

The "standards" against which the Subcommittee officially evaluated Ms. Jackson's work were those contained in the Revised June 1981 version of the Business School's "Policies and Procedures with Respect to Faculty Appointments and Promotions" [hereinafter "1981 Standards"]. These 1981 Standards replaced the 1977 "Policies and Procedures with Respect to Faculty Appointments and Promotions" [hereinafter "1977 Standards"]. Although promulgated in June 1981, the 1981 Standards were not distributed to the non-tenured Business School faculty until September 15, 1981. In other words, the text of the Standards under which Barbara Jackson was evaluated for tenure was not available to her until *after* she had submitted her tenure portfolio.

Ms. Jackson maintains that the 1977 and 1981 Standards are materially different. She contends that in preparation for her 1981 tenure review she developed her portfolio of academic work with reference to the 1977 Standards, that she expected to be evaluated under those standards, that she met those standards, and, therefore, that she should have received tenure. She contends that the fact that her tenure candidacy was evaluated under Standards published after her portfolio was submitted should be considered substantial evidence that she was not given a genuine opportunity to receive tenure in 1981.

I find, however, that the differences were not material; and that, even if they were, the 1981 Standards were applied to Ms. Jackson in a way that did not prejudice her. Ms. Jackson was *formally* reviewed for tenure in 1981 under the 1981 Standards; however, she was *effectively* evaluated under the 1977 Standards.

Plaintiff maintains that the core difference between the 1977 Standards and the 1981 Standards was that under the former a Business School professor had to demonstrate excellence in *either* a) teaching and course development, *or* b) research, to be qualified for tenure, whereas under the latter the candidate was deemed unqualified unless he or she could. demonstrate excellence *both* in teaching and course development *and* in research.

Dean McArthur and Dean Gordon Don-

---

violation" of Title VII regardless of the resolution of this question. The 1981 tenure review decision was not so much "a distinct act of discrimination" as part of an extended process. Dean McArthur himself described the 1981 events as not a tenure denial but a decision to extend tenure review. Hence, the 1981 and 1983 reviews can be viewed as constituting one continuing violation that became actionable upon the 1983 denial of tenure, when plaintiff became aware that she would in fact be injured. *See Johnson,* 840 F.2d at 137. "If plaintiff *had* instituted [her] discrimination claim in 1981, before the results of the [tenure review process] had been determined, it is likely that it would have been dismissed as unripe, since at that point it was undetermined whether the review process would in fact cause plaintiff any injury." *Id.* at 137–38.

Of course, my ultimate finding that plaintiff was not the victim of gender-based discrimination reduces to a nullity this issue of the actionability of the 1981 decision. Accordingly, even if I viewed the 1981 decision as the basis of a wholly independent Title VII claim—and plaintiff does not expressly argue that I should—defendants would still prevail.

aldson[14] testified that the 1977 and 1981 Standards represented two snapshots at different times of an evolving consensus among the tenured faculty at the Business School concerning the profile future tenured faculty members should have.

The policies in place at the Business School during the 1960's and early 1970's allowed professors to come up for tenure on either a teaching track or a research track. The unintended consequence of this two-track system had been the creation of a two-caste tenured faculty, one caste consisting of researchers and the other caste of teachers. This dichotomy came to be seen as not conducive to collegiality. The tenured faculty gradually decided that the way to eliminate the schism that had been created would be to require excellence in both teaching and research from future tenure candidates. This policy evolved over a two-decade period and different stages in that evolution were captured in the 1977 and 1981 written Standards.

The difference between the requirements for tenure at the Business School in the quarter century between the early 1960's when Deans McArthur and Donaldson received tenure and the requirements today may be substantial. However, the actual difference between the 1977 and 1981 Standards at issue here is not nearly as dramatic as plaintiff has maintained. Those Standards are not materially different. They represent separate points along an evolutionary path, but the points are sufficiently close together so as to be indistinguishable for purposes of this litigation.

Plaintiff alleges that the core differences between the 1977 and 1981 Standards may be seen by comparing paragraph 6 of the 1977 Standards with paragraph 5 of the 1981 Standards. Paragraph 6 of the 1977 Standards provides in relevant part:

[F]or the large majority of its tenured Faculty, the School seeks persons who:

a) have demonstrated effectiveness in classroom teaching and course maintenance;

b) have demonstrated excellence in research or creative course development, or both;

c) have demonstrated outstanding performance, overall, when teaching, research, and course development are taken together.

Paragraph 5 of the 1981 Standards provides in relevant part:

[F]or the large majority of its tenured faculty the School seeks persons who:

a) have demonstrated effectiveness in classroom teaching and in the normal maintenance of established course materials; and

b) have demonstrated the excellence of their published work based on research and creative course development, the mix of which may appropriately vary widely across the pool of candidates; and

c) have provided persuasive evidence of the capacity for intellectual leadership and for self-renewal essential to a productive tenured academic career.

These paragraphs and the provisions contained in each should not, of course, be read in isolation from the remainder of the respective Standards, which indicate that the tenure requirements in those paragraphs are not be read as setting out a rigid calculus.[15] However, even if read in

---

**14.** Dean Gordon Donaldson became a tenured member of the Business School faculty in 1963. He served as faculty Appointments Coordinator from 1975 until early 1980. Shortly after John McArthur became Dean of the Business School in January 1980, Professor Donaldson was appointed Senior Associate Dean for Faculty Development, a position he held until April 1986. As Appointments Coordinator and Senior Associate Dean for Faculty Development, Professor Donaldson was the person primarily responsible for managing the entire promotions process, including the process by which associate professors at the Business School were reviewed for promotion to tenured professorships. Professor Donaldson drafted both the 1977 and 1981 Standards, and in both 1981 and 1983 he managed Barbara Jackson's tenure review process.

**15.** *See, e.g.,* 1977 Standards ¶ 1 ("This general statement of policy cannot be exhaustive and it should not be treated literally in all cases. The task of building a university graduate school faculty is a creative work which must call for the exercise of judgment on many considerations in a variety of combinations."); 1981 Standards ¶ 1 ("This general statement of policy cannot be exhaustive. The task of building a univ-

isolation from the documents from which they are taken, these paragraphs establish substantially identical requirements for tenure. It is apparent, and the parties agree, that paragraph 6(a) of the 1977 Standards and paragraph 5(a) of the 1981 Standards state precisely the same requirement, namely the requirement of excellence in classroom teaching and in the routine maintenance of course materials. It is also apparent, and all but conceded by both sides, that paragraphs 6(c) and 5(c) of the 1977 and 1981 Standards, respectively, establish identical requirements. And it is indisputable that even though paragraph 6 of the 1977 Standards does not contain the word "and" at the end of either provision "a" or provision "b," its provisions are conjunctive, as are the three provisions of paragraph 5 of the 1981 Standards.

Plaintiff maintains that the central difference between the two paragraphs resides in the respective "b" provisions. She contends that while 1977 paragraph 6(b) requires "excellence in research *or* creative course development," 1981 paragraph 5(b) requires excellence in "research *and* creative course development."

Plaintiff's construction of the respective "b" provisions ignores the segment of paragraph 5(b) that follows the comma after the words "course development." This segment effectively reduces the "and" which joins "research" and "creative course development" to an "or"; after all, if, as the provision provides, "the mix [of research and creative course development] may appropriately vary widely across the pool of candidates," it may vary with respect to a particular candidate almost to the point where the candidate may excel just in research *or* just in creative course development. Thus the conjunctive in paragraph 5(b) of the 1981 Standards appears to be effectively the equivalent of the disjunctive in the 1977 Standards. For this reason, I have concluded that the 1977 Standards were not materially different from the 1981 Standards.

However, even if they were materially different, Barbara Jackson was effectively evaluated under the 1977 Standards. This conclusion is evidenced by the fact that Ms. Jackson's Subcommittee voted 3–1 that she had met the Standards necessary for tenure. By plaintiff's own admission, no one applying plaintiff's understanding of the 1981 Standards to plaintiff's candidacy could have found her qualified for tenure in 1981, since Ms. Jackson had not done sufficient "research." Thus, the 3–1 vote indicates that at least three of the members of plaintiff's 1981 Subcommittee mixed her research and course development together in such a way as to evaluate primarily her "creative course development," i.e., as set forth in the 1977 Standards, paragraph 6(b). The Subcommittee noted that the Standards had evolved between 1977 and 1981, but "unanimously fe[lt] the differences [we]re immaterial for purposes of this case." I agree.

My conclusion that plaintiff was effectively evaluated under the 1977 Standards is also supported by the reason Harvard has articulated as the non-discriminatory reason for denying tenure to plaintiff: plaintiff's alleged failure to demonstrate sufficient creativity. This is essentially a contention that plaintiff failed to meet the requisite for tenure set out in paragraph 6(b) of the 1977 Standards.

The issue whether defendants applied the 1977 Standards in a disparate manner to plaintiff and to male candidates for tenure is addressed *infra* in Section V.C. For present purposes, I note here my finding and conclusion that the non-sex-based standard to which defendants point to meet their burden of proof under Title VII is fully consistent with application of the 1977 Standards. In other words, as a matter of fact, even if there is a formal difference between the 1977 and 1981 Standards, plaintiff was effectively evaluated for tenure in 1981 by the very standards against which she had prepared herself to be evaluated.

ersity graduate school faculty is a creative work which must call for the exercise of judgment on

many considerations in a variety of combinations which cannot be detailed in advance.").

### 3. The Full Committee in 1981

The Subcommittee's unanimous recommendation that Ms. Jackson receive tenure was presented to the Full Committee for preliminary consideration on November 17, 1981. Sixty-three tenured faculty members were present at this preliminary meeting. Following a wide-ranging discussion of her candidacy, sixty-one members voted on the question. Forty-seven persons voted to grant tenure, seven voted to terminate her, one voted that she be reappointed without tenure, and six abstained. The sixty-one persons voting included the eight members of Ms. Jackson's department—the Marketing Area. The eight Marketing professors all voted that Ms. Jackson be promoted. It is undisputed that the level of support Ms. Jackson received on this preliminary ballot constituted the "substantial majority" required for a tenure recommendation.

Twenty-five days after the preliminary vote, the Full Committee reconvened for its final consideration of plaintiff's candidacy for tenure. When the votes were tallied at this second meeting, plaintiff's substantial majority had evaporated. Seventy-one tenured faculty members were present for the final vote, and sixty-eight voted. Twenty-nine voted to promote Ms. Jackson, twenty-seven voted to terminate her, eight voted that she be reappointed without tenure, and four abstained. Of the group of professors who had voted during the first round of voting, only twenty-five voted for promotion on the final ballot, and twenty-four voted for termination. Thus, among those who participated in both ballots, plaintiff had gone in a 25–day period from a promote to terminate ratio of 47:7 to a ratio of 25:24.

Even more remarkable than the overall dissipation of plaintiff's support was the fact that of the eight members of her own department who had voted during the preliminary round and given plaintiff their unanimous support, only four voted for tenure on the final ballot. Two who had voted for tenure on the first ballot voted to terminate; two others voted on the final ballot for reappointment without tenure. In other words, over a 25–day period, four

of the professors who had worked most closely with plaintiff changed their minds on the most important question of plaintiff's academic career. Something had happened, something rather dramatic.

Unfortunately, as noted above, the parties have not introduced evidence in the case from which I can make supportable findings as to what that dramatic something may have been.

Plaintiff's support on the final ballot was still significant, but it no longer constituted a substantial majority of the Full Committee. Therefore, in accord with the normal policy of the Business School, Dean McArthur did not recommend to the President of the University that plaintiff be promoted with tenure.

### 4. The 1981 Reasons for Denial of Tenure

Dean McArthur articulated the reasons for Ms. Jackson's lack of promotion in 1981 in a January 15, 1982 letter to her. In that letter he indicated that she was unsuccessful in obtaining substantial support largely because she had failed to prove creative ability sufficient to satisfy a substantial majority of the tenured faculty. According to Dean McArthur, the Full Committee regarded Ms. Jackson as an outstanding teacher. It was satisfied that she was superb at taking the ideas of others and making them accessible and comprehensible to others. A substantial majority of the Full Committee was not, however, satisfied that she was able to create new ideas. In the estimation of a substantial portion of the tenured faculty, Ms. Jackson had failed to meet the standard for tenure required under paragraph 6(b) of the 1977 Standards and paragraph 5(b) of the 1981 Standards.

The Full Committee's decision was based on a review of plaintiff's overall record at the Business School. The determination that she had not demonstrated adequate creativity was based on an evaluation of her work in *both* Managerial Economics and Marketing. By evaluating her work as a whole, defendants fulfilled the promise that had been made to plaintiff when she transferred from Managerial Economics to

Marketing, namely, that the transfer would not hurt her chances for tenure since it would not matter what area her work was done in, as long as the work was good. In this connection, I reject plaintiff's contention that the 1981 Full Committee unfairly focused exclusively on her Marketing work.

I recognize that Dean McArthur told plaintiff in December 1981 that he would not recommend her for tenure because she had not done enough work in Marketing per se. And I note that in the letter dated January 15, 1982, the Dean told Ms. Jackson that

> [a]s regards your work in marketing, there was unanimous agreement among both internal and external reviewers that you have not yet produced a record of outstanding course development or research in the broad field of marketing.

However, I reject plaintiff's invitation to read these isolated comments to mean that her work in Managerial Economics was not considered by the Full Committee in 1981, and that she was denied tenure because of failure to demonstrate creativity in Marketing research. When one views the Dean's remarks in context, it is clear that the Full Committee considered her Managerial Economics work alongside her Marketing work, and found the work in *both* areas to be insufficiently creative. For instance, on the same page of the January 15, 1982 letter relied upon by plaintiff for the proposition that only her Marketing work was considered, the Dean also states:

> The models work [in Managerial Economics] was construed to be creative pedagogy, rather than creative conceptual development. Moreover, the view that it was creative pedagogy was not unanimous.
>
> The multivariate work [in Managerial Economics] was thought to represent something between normal course maintenance and creative course development, and not, in any event, creative conceptual development.

I find, as a matter of fact, that when the 1981 Full Committee assessed plaintiff's creativity, it considered her work in both Managerial Economics and Marketing.

### D. *1981–1983: Creating A Second Chance*

Despite the lack of a substantial majority in the Full Committee favoring tenure, Dean McArthur decided not to follow the Business School's normal practice of giving unsuccessful tenure candidates a one-year terminal appointment for the following academic year. Rather than denying tenure to Ms. Jackson, Dean McArthur arranged to hold her tenure review process in abeyance in order to give her another opportunity to demonstrate her qualifications for tenure.

In explaining the Full Committee decision to Ms. Jackson following the final vote in December 1981, Dean McArthur told her that the reason he did not want to terminate her with the usual one-year appointment was that he believed she had the capacity to develop new ideas. He told her that he was sure that, if given additional time, plaintiff could allay the doubts of the members of the Full Committee who had not supported her promotion. Consequently, the Dean recommended to plaintiff that she meet with him and other members of the tenured faculty to devise a plan to allow her to prove her creative capacity and, thereby, qualify for tenure.

#### 1. Establishing the Post–1981 Plan

Plaintiff agreed to meet with an informal committee, made up of Dean McArthur and several tenured faculty members from the Marketing Area, to develop a vehicle that would enable her to satisfy those who apparently did not believe she was able to create new ideas.

The informal committee met several times during the early months of 1982. As a result of these meetings, plaintiff proposed, and the informal committee agreed, that plaintiff should research and write a monograph on the subject of "account evolution paths," a subject described by plaintiff as "large, unstructured and . . . important." On March 23, 1982, following a meeting attended by plaintiff, Dean McArthur, Dean Donaldson, and several members of the Marketing Area faculty, Mr. Donaldson wrote and distributed to all attendees a memorandum containing his "understanding of the major areas of

agreement at the meeting." In this memorandum, Mr. Donaldson wrote that "[t]he objective of the work Barbara Jackson is now undertaking is to establish her reputation as a respected researcher in Marketing."

Plaintiff regarded this statement of the standard against which her monograph would be evaluated as an unfair summary of the informal committee's consensus. Moreover, she regarded the standard as impossible to achieve for a person, such as herself, who had spent a brief time in Marketing. Plaintiff, therefore, sent a memorandum to John McArthur, Gordon Donaldson, and the other members of the informal committee summarizing *her* understanding of the results of the series of meetings that had taken place between early January and late March. In her memorandum, she explained that she understood the purpose of the monograph was to alleviate the concern "some members of the appointments committee seem to have ... [with my] ability to create independently—and thereby to complete the evidence of my potential leadership in marketing at the School." Ms. Jackson's understanding was that she had to prove her creative potential through the monograph, and not that she had to establish herself as a *complete and respected researcher in Marketing.* She believed that the monograph had to prove she could create, and that it could do this without being a finished creative work in and of itself.

In a letter to Ms. Jackson dated April 14, 1982, nine days after the date of plaintiff's memorandum, Dean McArthur informed plaintiff that

> [a]fter reviewing and thinking about your memorandum and Gordon's minutes, I feel more comfortable with the draft Gordon prepared.... I think Gordon has captured the essence of what we discussed and tentatively agreed to at that meeting concerning your next appointment and assignment at the School. If you remain unclear or uneasy about this, I would suggest that we reconvene the group *for further discussion.*

Ms. Jackson discussed the differences she perceived between Dean Donaldson's memorandum and her own with Dean McArthur in his office shortly thereafter. Dean McArthur encouraged her not to draft any further memos and to get on with the project instead.

On June 9, 1982, plaintiff was reappointed as an Associate Professor of Business Administration, to serve until June 30, 1985. She was also freed from all teaching assignments so she could concentrate her energies on researching and writing her monograph.

### 2. Implementing the Post–1981 Plan

From early 1982 through the summer of 1983, plaintiff researched and wrote her monograph. She was in a hurry to finish because she believed that the longer the delay, the more harm would befall her reputation as an accomplished academician, which she believed to have been tarnished by the 1981 denial of tenure and by uncertainties regarding the Business School's contemporaneous search for senior faculty in the Marketing Area. By May 1983, however, certain members of the informal committee, who had continued to oversee plaintiff's progress, told Dean McArthur that they were concerned that plaintiff was rushing her work to the point of sacrificing quality for speed.

On May 5, 1983, after a meeting with plaintiff and a professor who had been reading partial drafts of plaintiff's monograph, Dean McArthur wrote to plaintiff as follows:

> The ultimate quality of the study on which you are working is much more important to us than its completion by any particular deadline prior to June 30, 1984. Therefore, rather than adhere to the deadline for appointments which are to be reviewed in the normal sequence this academic year, we will undertake to conduct your review within approximately three months of whenever you hand in your finished manuscript. Thus, so long as a reviewable manuscript is in no later than February 28, 1984, we should be able to conduct our review of your appointment prior to the end of the 1983–1984 academic year.

In addition, plaintiff knew she could have taken until as late as the summer of 1984 to submit her monograph if she wished to be reviewed in the 1984–1985 academic year.

Despite the knowledge of her actual deadlines, and despite Dean McArthur's apparent willingness to make special accommodations for her, Ms. Jackson continued her rush to judgment in the summer of 1983. She completed a draft of her monograph in July and sought observations and criticisms from several professors within the Business School. In response to her solicitation she received a fair number of positive and encouraging comments, as well as several highly critical reviews.

Among plaintiff's most critical reviewers were Professors Theodore Levitt and Robert Buzzell, both tenured professors with endowed chairs in the Marketing Area. On August 4, 1983, Professor Levitt sent plaintiff a short note attached to nine pages of comments on her July draft. Professor Levitt's observations included the following:

—"I remain very uneasy about the presentation, the use of 'evidence,' and the analysis."

—"[I]t is hard for me to see how the presentation has been very substantially improved over the previous version. A lot of the redundancy is gone, but a lot remains."

—"I don't think that this manuscript really does what it says it presumes to do—namely, clinical research with analysis based on it. What I mostly see is a lot of speculation about how situations really are, with very thin evidence as to what they are, and yet pretending as if the evidence were substantial and overwhelming."

—"Opinions and conclusions parade as evidence."

—"Chapter 12 ... is a potpourri of commonplaces, disjointed comments, and superficial factors that lead nowhere."

—"Chapter 15.... Very good idea, some good comments early in the chapter. The rest is superficial, sometimes gnawing, and a potpourri of stuff. It

is not research. It is not analysis. It's talk. It talks of the need for more study but doesn't say how, where, nor about the specifics of the problems and issues to be studied. It looks like the author is getting sick and tired of this whole manuscript and rushing to finish—making sure to cover all tracks by saying that the examples that have been used have indeed been simple, simplified, and simplifying, and that the analysis has been somewhat superficial. Therefore there is need for more research. It looks to me just a way of covering one's tracks."

—"In summary, I say there is something in this manuscript. There are some interesting constructs. But I do not think it should parade as research or rigorous development of concepts, or rigorous theoretical analysis. It is mostly a think piece, in some places really quite insightful, but elaborated into propositions that defeat communicability and credulity. The paradigm is good to help us think, but not very good as to specific guidance for specific situations. That in itself is not bad. But it is presented to us as if it were a piece of in-depth analysis and in-depth research. Yet it's devoid of empirical richness, it's light (but long) on analysis, and thus it is not persuasive. The paradigm is a creative achievement, and often the summarizing comments as to the dynamics of markets are insightful, though seldom based on the evidence the manuscript implies is there.

The whole thing leaves badly torn. It is a very neat idea. I think it is quite clever, the paradigm—but presented with lengthy analytical lightness, and with claims of validity based on data that are soft but which are asserted as being hard."

On August 16, 1983, Professor Buzzell sent plaintiff a five-page letter with his reactions to her July draft. Professor Buzzell's letter included the following comments:

—"[P]resentation seems a little self-congratulatory.... rather pompous."

—"[R]ather pretentious effect."

—"This whole discussion strikes me as force-fitting the data to a predetermined framework."

—"[N]ot really supported by data."

—"[D]on't really support the generalization.... Your [sic] simply assert that this happens 'in many instances'."

—"examples are purely hypothetical."

—"conclusions ... seem rather obvious."

—"As is Chapter VII, I don't see much connection with your field data."

—"Much of this seems to be a re-hash of general knowledge."

—"purely speculative."

—"still hard to read."

—"The biggest weakness is the sparsity of direct empirical evidence on account evolution.... the utility of the framework and of the quantitative model is not clearly shown."

—" 'impressionistic' use of evidence ... reduce[s] the credibility of the study as a whole."

—"Specifically, I would recommend: ... Especially, presenting more evidence— if you have it—on buying patterns over time."

Plaintiff testified that she drew on what she regarded as constructive in Professors Levitt and Buzzell's criticisms and made appropriate changes in her monograph. However, she discounted much of what they wrote because she perceived them as not understanding her task, which, according to her understanding, was to produce a "think piece," not a finished product.

On August 30, 1983, plaintiff submitted her monograph on account evolution paths, and asked for a tenure decision within three months. The monograph was submitted 26 days after receiving Professor Levitt's criticisms, and just two weeks after receiving Professor Buzzell's. Plaintiff chose not to be concerned with the fact that as tenured professors in her depart-

ment, Levitt and Buzzell would undoubtedly be influential in her tenure evaluation. Even though Professor Levitt had been on the informal committee established in early 1982 to formulate plaintiff's tenure project, plaintiff relied on her sense that he had misperceived the nature and scope of her charge, and effectively ignored the majority of criticisms contained in Professor Levitt's August 4th letter.

It is apparent, whatever the merits of Professors Levitt and Buzzell's criticisms may have been, that they both believed that plaintiff's work could be immeasurably improved by additional empirical research. They both believed that plaintiff's core idea was sound, interesting, and workable, and that what was needed was empirical support. In other words, their criticisms could have been addressed by additional work. However, plaintiff dismissed their central criticisms as based on a misapprehension of what she intended to be a "mere" exploratory study, and submitted her monograph six months before the deadline for tenure review during the 1983–84 academic year, and a year before what she understood to be the deadline for review in 1984–1985. At the time of the submission of the monograph, plaintiff had spent a total of 17–18 months working on it, far less than the time Harvard was willing to make available to her for the project.

E. *The 1983 Tenure Review*

1. The Subcommittee in 1983

In 1983, plaintiff's work was evaluated by the Business School's Standing Subcommittee. Plaintiff was aware of the identities of the Standing Subcommittee's members, and did not object to any of them.

The 1983 Subcommittee limited its evaluative focus to plaintiff's monograph. In September 1983, following plaintiff's submission of her monograph, the 1983 Subcommittee distributed it for review and comment to ten outside reviewers, consisting of eight academicians [16] and two practi-

---

**16.** It appears that two of the eight outside academic reviewers of plaintiff's monograph were professors whom plaintiff regarded as inappropriate. Prior to the Subcommittee's solicitation of their reviews, plaintiff relayed her views about these persons to the Subcommittee through a professor who acted as her "conduit of information into the appointments process."

tioners. The Subcommittee also solicited the opinions of members of the Business School Marketing Area. It received replies from eight of the ten outside reviewers, and from seven members of the Business School faculty. The monograph was evaluated for intellectual quality, creativity, soundness of research design and execution, and potential impact.

The standard adopted by the Subcommittee for measuring the value of plaintiff's monograph was the standard stated in the Donaldson "minutes" of March 23, 1982. The 1983 Subcommittee Report states that "[t]he [Subcommittee] has undertaken an evaluation of the monograph, particularly in light of the standards given in the Donaldson memorandum." The Report framed "the issue which the [Subcommittee] was asked to address" by asking: "Does the Jackson monograph meet an appropriate standard of excellence? ... [Does the work] '... establish her reputation as a respected researcher in Marketing'[?]" The Subcommittee did not consider plaintiff's perception of the intended role of her monograph, and did not inform the individual evaluators of the monograph of the dispute between the Donaldson standard and plaintiff's view of the intended role of the monograph.

The comments received by the evaluators and conclusions reached by the Subcommittee coincided with the observations plaintiff had received from Professors Levitt and Buzzell in August 1983. Many of the comments, from both within and without the Business School, noted that the monograph seemed incomplete, inadequate, and hastily written. For example:

—"[I]t is not just a matter of a redraft, though that would help."

—"If Barbara had spent more time trying to pull her thinking together ... the manuscript would have considerably more power than it does."

—"[T]he monograph is far from being complete or in a form in which it is likely to have any significant impact."

—"In my opinion, the supporting evidence would have had greater validity if she had done more in-depth and systematic interviewing at her research sites."

—"[T]he use of information from other sources ... seems to be an opportunistic, after-the-fact force-fitting of data collected for other purposes into the framework of this study."

—"In view of the complexity of the topic she has chosen to study, it is hardly surprising that her condensed timetable has resulted in a disappointing manuscript."

—"Interesting concepts but not fully developed and an unfortunate tendency to generalize with no sufficient rationale or empirical support."

—"Some of the concepts are interesting and creative. Unfortunately they were not fully developed."

—"My sense is that the work suffers from being rushed. It is not a finished product and it is difficult to read."

—"I don't believe that the document is a completed piece of research."

—"[I]t commences in a promising manner, but does not deliver results commensurate with its promising start."

—"It is particularly disappointing to me that she had several outstanding concepts to work with, and never made them into something with the kind of impact that the ideas deserve."

—"The resulting melange is somewhat disjointed."

—"[S]he has to undertake a major revision and a serious research effort to test the hypotheses she can develop in this area."

The Subcommittee recognized that plaintiff's monograph did not receive uniformly

---

There is no evidence in the record that candidates ever had any say over who the outside reviewers of their written work would be. In addition, plaintiff's reasons for not wanting the two persons at issue to evaluate her work had nothing to do with gender considerations. Accordingly, the inclusion of these two persons among the group that evaluated plaintiff's monograph is of only marginal relevance in this proceeding.

negative reviews from all of its readers. However, the Subcommittee

consider[ed] that the negative components of the[ ] reviews [were] sufficiently strong to rule out an affirmative finding on the issue addressed. The weight of opinion ... indicate[s] that the monograph has not "demonstrated excellence." Further, this piece of work does little "... to establish her reputation as a respected researcher in Marketing."

Accordingly, the 1983 Subcommittee unanimously recommended against plaintiff's promotion.

Plaintiff does not dispute the negative assessments of her monograph. She maintains that if she had been asked to apply the specific Donaldson standard (i.e., the "establish her reputation as a respected researcher in Marketing" standard) to her monograph in the fall of 1983, she would have reached the same conclusions as the majority of her readers. However, she contends that the Donaldson standard was the wrong standard, indeed an impossible standard for her work to have met. She regards the fact that the Subcommittee applied that standard as symptomatic of the fundamental unfairness and pretextual nature of her entire tenure review. She maintains that the Donaldson standard was not only erroneous—it did not represent the consensus of the informal committee— but an impossible one for her to have met in the time allotted. In addition, she contends that her 1983 Subcommittee Report indicates that her second-round tenure decision was based solely on her monograph, whereas when males had received an extended tenure review, their ultimate tenure decisions did not stand or fall on a single written work; rather, she maintains, their receipt or denial of tenure was determined by a review of the entire corpus of their work.

I find, as a matter of fact, (1) that plaintiff was not evaluated under an unfair standard in 1983; and (2) that plaintiff's entire career was taken into consideration in the ultimate decision not to recommend her for tenure in 1983.

(1) I recognize some force to plaintiff's argument that the standard under which her monograph was evaluated in 1983 was difficult to meet. Plaintiff had not even entered the field of Marketing until 1977. Between 1977 and 1982 her written work had been devoted to course development. To have expected her to produce a completely finished research paper on a complicated problem in Marketing within a two- to three-year period would have been quite demanding; and to have expected her to produce a work of sufficient quality to establish herself as a respected researcher in Marketing would have been extraordinarily ambitious. However, this is not what defendants expected. I have concluded that the Subcommittee judged plaintiff's monograph by a standard that was no different from the standard it applied to all written work by candidates for tenure at the Business School. This conclusion is based on my assessment of Dean McArthur's and Dean Donaldson's testimony, and on the fact that the 1983 Subcommittee Report states that,

[i]n addition to evaluating the monograph in the light of the specific wording of the Donaldson memorandum, the members of the Subcommittee considered the monograph in the more general light of a piece of work by a tenured professor. We feel that it lacks intellectual rigor, whether judged as "case-method" research or as research of some other kind.... The research design leaves gaps in the understanding of how this research is related to other pieces of research. Further the design as well as the execution are flawed. It follows that the work we have studied has little potential for impact. Overall this monograph does not meet a standard of excellence appropriate for tenure rank at this School.

(2) Although the 1983 Subcommittee focused its evaluation on plaintiff's 1983 monograph, plaintiff's 1983 tenure review took her entire career into consideration. As explained above, the Subcommittee evaluation and report is only one part of the Business School's tenure review process. When plaintiff's candidacy went be-

fore the Full Committee in 1983, all of her work, including her work in Managerial Economics, was taken into consideration.

### 2. The Full Committee in 1983

Pursuant to normal practice, the 1983 Full Committee met twice to discuss and vote on plaintiff's candidacy for tenure. On the first ballot, following the discussion at the first meeting, the vote was 19 to promote, 18 to terminate, two to reappoint without tenure, and 13 abstentions. Following this vote, Dean McArthur asked Professor James Heskett, a strong supporter of Ms. Jackson and a member of the Full Committee, to address the Full Committee at its second meeting, and to state the case in favor of plaintiff's appointment.

At the second 1983 meeting of the Full Committee, Professor Heskett addressed the Full Committee as the Dean had requested, and other supporters of Ms. Jackson were afforded the opportunity to address the Full Committee as well. Following the discussion at the second meeting, the Full Committee voted 36 to promote and 31 to terminate, with three abstentions.

If, as plaintiff maintains, her 1983 tenure review was limited to her monograph as measured against the Donaldson standard, it would have been highly unlikely that she would have received majority support for promotion, as she did, from the Full Committee. By plaintiff's own admission, her monograph, in its fall 1983 form, did not meet the Donaldson standard. The fact that she received the extensive support that she did suggests that her tenure review process in 1983 involved consideration of far more than just her inadequate monograph.[17]

### 3. The 1983 Reasons for Tenure Denial

The 36 votes for promotion which plaintiff received on the second ballot in 1983 constituted majority support. They did not, however, constitute the substantial majority required by Dean McArthur as a condition precedent to recommendation of a candidate for tenure to the President and governing bodies of the University. Accordingly, Dean McArthur did not recommend plaintiff for tenure, thus ending her candidacy.

In a letter written to plaintiff on December 16, 1983, Dean McArthur explained the decision not to recommend plaintiff for tenure as follows:

I truly regret that it is not possible for me to recommend to the President and the Governing Boards that you be appointed to the rank of full professor with tenure.

... As you know, and as stated in the School's "Policies and Procedures for Promotion to Tenure," demonstrated excellence in research and course development is required for appointment to tenure. Your work as reviewed in 1981 was judged not to achieve this standard. The extension of your contract at that time was to provide you with an opportunity to produce conceptual work of the required quality.

In reviewing the results of your research since 1981, most internal and external reviewers and members of the Appointments Committee [Full Committee] agreed that the research and resulting manuscript does not meet our standards for demonstrated excellence in research and creative course development. The weight of opinion considered by the Committee was clearly that the work you have completed does not satisfactorily answer the questions many members had about your capacity to do creative conceptual work in Marketing.

In reviewing your overall record once again, including your recent research, the members of the Appointments Committee remain roughly evenly divided in their support for your promotion. On the basis of your record and the substantial opposition to your promotion, I cannot recommend that you be given a tenured appointment at the School. In fact, it would be highly inconsistent with our past practice in promotion cases for me to recommend a tenured appointment

---

**17.** Also supporting this conclusion is the December 16, 1983 letter from Dean McArthur to plaintiff stating that the Full Committee reviewed plaintiff's "overall record once again." *See generally infra* Sec. IV.E.3.

when there is not a clear affirmation of support from, at minimum, a large majority of the Committee.

I credit this letter as a good faith and accurate explanation of the reason that plaintiff did not receive a recommendation for tenure in 1983. Plaintiff was denied tenure in 1983 because she had failed to convince a substantial majority of the tenured faculty that she possessed the level of creativity required for tenure at the Business School. Plaintiff's monograph had failed to answer the concerns identified in her 1981 tenure review. A significant percentage of the tenured faculty did not believe that plaintiff's record evidenced a capacity on her part to do creative conceptual work.

The skeptics on the tenured faculty may well have been mistaken with respect to the creative potential of plaintiff's monograph. Plaintiff turned her monograph into an article published in the November–December 1985 issue of the Harvard Business Review, and also used the the monograph's materials as the basis for a book on marketing, *Winning and Keeping Industrial Customers: The Dynamics of Customer Relationships*, published in 1985 by Lexington Books. In addition, the concept of "relationship marketing" which plaintiff discussed in her monograph was cited approvingly by Professor Philip Kotler[18] of Northwestern University in his keynote address to the 50th Anniversary Meeting of the American Marketing Association.[19]

But the existence of differences in opinion regarding the quality of plaintiff's work does not demonstrate gender discrimination. In the five years between her tenure denial in 1983 and the trial in this matter, plaintiff was not able to find a single person who would say that she was denied tenure because she was a woman. In fact, even Ms. Jackson's most ardent supporters have not come forward with a single statement supportive of plaintiff's contention that she was denied tenure because of her gender. For example, Professor Howard Stevenson, a tenured professor at the Business School, an active supporter of Ms. Jackson's candidacy in 1983, a person who testified that the standard against which plaintiff's 1983 monograph was measured was an "impossible" one to meet, and an individual who believes that it is more difficult for women to get tenure at the Business School than for men, testified that he could not identify anything in the Business School's tenure process with respect to Barbara Jackson that indicated sex bias.

### F. Aftermath of 1983 Tenure Decision

Following her denial of tenure in December 1983, Ms. Jackson requested that her contract, due to expire June 30, 1985, be terminated as of June 30, 1984. Her request was honored, and Ms. Jackson's resignation became effective June 30, 1984.

On April 16, 1984, plaintiff signed a contract with Index Systems, Inc., a business consulting firm based in Cambridge, Massachusetts. Under the terms of the contract, Ms. Jackson agreed to start work with Index at a base salary of $80,000 per year plus bonuses.[20]

On October 19, 1984, Ms. Jackson received a right to sue letter from the Massachusetts Commission Against Discrimination ("MCAD") and the federal Equal Employment Opportunity Commission ("EEOC"). She timely filed her Title VII action in this court on December 24, 1984.

**18.** Professor Kotler is an internationally recognized academic authority on marketing.

**19.** Plaintiff suggested in her testimony that she created the concept of "relationship marketing," and that Professor Kotler identified it in his address as her concept and as one of the seven "milestone marketing concepts ... that have helped to shape the discipline [in the 1980's]." Plaintiff did not, however, introduce into evidence a copy of Professor Kotler's address. Instead, she introduced a newspaper account of the address from the July 31, 1987 issue of Marketing News. That article suggests that Professor Kotler did not identify plaintiff as the creator of the concept of "relationship marketing," but as the person who "highlighted" the concept.

**20.** When plaintiff resigned from the Business School she was earning an annual salary of approximately $43,000.

## V.

### FINDINGS REGARDING CIRCUMSTANTIAL EVIDENCE

It is apparent from the discussion in Section IV that there is nothing which might be called direct evidence of gender discrimination in plaintiff's tenure review. In closing argument, counsel for the plaintiff did not point to any particular smoking gun but rather chose to cast plaintiff's proof as an accumulation of circumstantial evidence indirectly establishing discrimination. Alluding to a passage by Cardozo, he argued that "the idea of plaintiff's case ... is to put together a multitude of little things which add up to an evil to be remedied." [21] This multitude of little things may be classified in three basic categories: (A) a discriminatory environment at the Business School, (B) procedural irregularities in plaintiff's tenure review, and (C) disparate treatment of male tenure candidates. I do not, however, find that this collection of indirect evidence adds up to any showing of gender-based discrimination against Ms. Jackson in the tenure process.

### A. Environment at the Business School

The First Circuit has been receptive to the use of circumstantial evidence regarding the overall environment in discrimination cases. The principles were set forth in *Sweeney:*

> Proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual, but evidence of such an atmosphere may

be considered along with any other evidence bearing on motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts.

604 F.2d at 113. As the Court observed more recently:

> [C]ircumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add "color" to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir.1987).

In light of these broad pronouncements, the plaintiff was afforded full scope in developing proof regarding the environment at the Business School.

#### 1. Opportunities for Women
##### a. Female Faculty

The first element of the Business School environment that plaintiff points to is the percentage of tenured female faculty. When Ms. Jackson first came up for tenure in 1981, there was only one tenured woman professor—Regina Herzlinger—on a tenured faculty of approximately 80 persons. [22] And Professor Herzlinger was the second woman in the history of the Business School to have received tenure. At the

---

**21.** *See* B. Cardozo, *A Ministry of Justice,* in *Law and Literature* 41, 52–53 (1931) ("Sometimes the inroads upon justice are subtle and insidious. A spirit or a tendency, revealing itself in a multitude of little things, is the evil to be remedied. No one of its manifestations is enough, when viewed alone, to spur the conscience to revolt. The mischief is the work of a long series of encroachments.").

**22.** The plaintiff also makes reference to differential employment conditions which had been the subject of complaint by Professor Herzlinger. Professor Herzlinger complained to Dean McArthur in the early 1980's that women faculty members were paid less than men. However, she testified by stipulation that the Dean con-

vinced her "that the salary differential was attributable not to sex, but to age and years on the job."

Professor Herzlinger also testified that she thought bias was involved in the decision not to let her teach when she first joined the faculty in 1971. However, she cautioned that she could not be sure whether the bias was merely personal or was directed "against women in general." In any event, Professor Herzlinger "does not believe that different criteria are applied to women than to men in the process of reviewing candidates for promotion to tenure at Harvard Business School. Nor does she believe that women candidates for tenure have to meet higher standards than male candidates."

time of trial—seven years after Barbara Jackson was first reviewed for tenure at the Business School and four years after the current action was commenced—there were still only three tenured women on a tenured faculty of approximately 84.

Those figures, while striking, are not in themselves particularly probative in a disparate treatment case. Nor, as the Supreme Court emphasized at the end of the past term, would such statistics be probative even if this case had been framed in terms of a disparate impact theory. Rejecting an analysis which found a prima facie case of employment discrimination solely on a statistical showing of a high percentage of white workers in a set of higher paying jobs and a low percentage of white workers in less desirable jobs, the Court firmly concluded that a pure proportionality approach "misapprehends our precedents and the purposes of Title VII." *Wards Cove Packing Co. v. Atonio,* —— U.S. ——, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989).

> "There can be no doubt," as there was when a similar mistaken analysis had been undertaken by the courts below in [*Hazelwood School Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977)], "that the ... comparison ... fundamentally misconceived the role of statistics in employment cases." The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." *Ibid.*

*Id.*

The plaintiff here offered no evidence linking the modest number of female tenured faculty to an analysis of the qualified labor market for Harvard Business School professors. Rather, recognizing that the development of qualifications in such a labor market requires at a minimum a lengthy preparation process which is likely to include graduate education in a Business School, the plaintiff offered evidence concerning admissions to the Business School. However, as I discuss in the next section, the admissions statistics developed at trial were not helpful to plaintiff's case.[23]

### b. Female Admissions

The plaintiff's essential contention as to admissions is that the percentage of female applicants admitted to the Business School levelled off at approximately the time her tenure review began. From this the plaintiff sought to argue the inference that Harvard was establishing at the entry level a serious restriction upon female opportunities at the Business School. That analysis is superficial, however, because from 1973 to 1979, the percentage of female applicants roughly doubled—from about 12 per cent to about 26 per cent—whereas from 1979 to the present, the percentage of female applicants has remained fairly constant at 23 to 26 per cent.

As the rate of female applications has levelled off, moreover, the Business School has increased its acceptance rate for women. For example, in 1973, 12 per cent of the applicants were women and 11 per cent of the admissions were women. From 1981 to the present, however, the acceptance rate for women has been slightly higher than the applications rate. In 1983, for example, approximately 24 per cent of applicants, but approximately 25 per cent of admissions, were women. And in every year since 1981 female applicants have

---

**23.** I permitted the plaintiff to adduce admissions evidence despite the fact that at an early stage of this litigation both Magistrate Cohen and Judge Garrity took the position that such evidence was not relevant. Adopting the views of the Magistrate, Judge Garrity concluded that "[t]he selection of students is not an employment practice and is based on considerations wholly different from those used in making employment decisions." *Jackson,* 111 F.R.D. at 474; *cf. Wygant v. Jackson Board of Educ.,* 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion) ("There are numerous explanations for a disparity between the percentage of minority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind."). In receiving this evidence, I accepted the plaintiff's theory that a policy of restricting the number of women admitted to the Business School can be seen as an effort to constrict the pipeline through which women can become part of the qualified labor pool for tenured faculty. The defendants, of course, were afforded the opportunity to rebut this theory with evidence of their own. They did so persuasively.

been admitted to the Business School at a higher rate than male applicants.

## 2. Climate and Atmosphere

The plaintiff has referred to a variety of comments and observations by various members of the Business School community as illustrative of a climate or atmosphere of discrimination. A large number of these comments were made well before the plaintiff's tenure review process began and are manifestly too remote from the tenure decision-making process to have any relevance in this action.[24] Similarly remote from the issues in this action is the allegation that when plaintiff started teaching at the Business School in 1973, the door at the Faculty Club labelled "Faculty Coatroom" actually led to the men's restroom.

More pertinent are three sets of comments from members of the Business School administration bearing upon opportunities for women at the Business School. In addressing these remarks, I bear in mind the Supreme Court's recent observation regarding the significance of such commentary. "Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part." *Price Waterhouse*, 109 S.Ct. at 1791 (plurality opinion) (emphasis in original).

### a. The Saalfield and McGowan Comments

Anne McDonough worked in the admissions office of the Business School from 1974–1980. From July 1978–July 1980, Ms. McDonough was the Director of Admissions. In her capacity as Director, she was a member of a small committee that made MBA Program admissions decisions.

Ms. McDonough testified that in April 1978, three months before her formal appointment as Director of Admissions, Assistant Business School Dean James Saalfield cautioned her that as Director of Admissions she should not get carried away admitting too many women to the MBA Program, because there were enough women in the program already.

At approximately the same time, Ms. McDonough also had a conversation with Jim McGowan of the Business School's financial office, in which Mr. McGowan stated that a study done regarding fund raising for the Business School indicated that women alumni did not contribute to the school to the same degree as male alumni. Mr. McGowan indicated that this "fact" should be borne in mind in determining whether to admit a large number of women.

At the time these statements were made, neither Dean Saalfield nor Mr. McGowan was in any way involved in MBA Program admissions. Neither had any authority over Ms. McDonough, and neither had any say in the formulation of admissions policies. Moreover, Ms. McDonough took their comments as advice, not definitive instruction, and she stated unequivocally that she ignored the advice. An examination of admissions data during Ms. McDonough's tenure as Admissions Director discloses no

---

24. These examples are: (a) a comment made to plaintiff in January 1973 by then Dean Larry Fouraker to the effect that "women were not successful in the HBS classroom"; (b) the fact that in September 1973, on plaintiff's first day as a teacher at the Business School, Professor Harry Hansen of the Marketing Area welcomed a group of approximately 160 MBA students, roughly 11% of whom were women, by calling the students "you men" and telling them to find the "man on the faculty" to whom they were assigned for orientation; (c) Professor Hansen's alleged routine use of a female student to play the role of housewife during in-class simulations in 1973; (d) the fact that during the

1974–75 school year, a male professor at the Business School found it "cute" and rather liked it when a woman who was one of his brightest students giggled while delivering dazzlingly intelligent oral answers in class; (e) insensitivity expressed during the 1975–76 school year by the head of the MBA Program to the problem of bias against women at the Business School; (f) the fact that men on the doctoral admissions committee in 1977–78 initially considered deferring an otherwise qualified female applicant because she happened to have young children and one of the men believed that having children would be a "maturing process for the mother."

basis for concluding that Ms. McDonough or anyone else actually involved with admissions acted on these comments by restricting female admissions.

### b. The Donaldson Comment

Gordon Donaldson testified that in his opinion it is more difficult for women to become members of the tenured faculty than for men. In explaining the basis of his opinion, Dean Donaldson said:

> The basis is, basically, that I believe that in society at large, there's a reluctance to accept women into certain leadership roles in certain areas where they traditionally have not had such roles. I believe that business is one of those areas. And given that that's what seems to be true of the population at large, I have no reason to believe that there isn't some element of that in our student body and among our faculty.

Plaintiff acknowledges that at first blush Dean Donaldson's comment is little more than lumpen sociology, an innocent observation by a sensitive man suggesting that even some at the Harvard Business School rise and fall with the tides of societal attitudes. However, plaintiff contends that the difference between the Donaldson statement and a truly innocent observation is the source. Gordon Donaldson, after all, was the person in charge of managing the appointments review process, including tenure review, during the period of time when Barbara Jackson was considered for tenure. Plaintiff maintains that the Donaldson statement, despite its patina of guilelessness, betrays a failure on the part of the Business School to meet its obligations under Title VII. It appears to be plaintiff's contention that Title VII exists because what society does is wrong; and, therefore, those in managerial or policy-making positions such as Gordon Donaldson are obliged to correct, not reflect, the prejudices of society.

I find, however, that Dean Donaldson's statement, which plaintiff portrays as evidence of discriminatory intent, is merely a recognition that the general culture's stereotypes and prejudices undoubtedly influence, albeit indirectly, the composition of the Harvard Business School student body and faculty. This recognition that Harvard is not insulated from the consequences of more general societal attitudes that continue to pervade our culture does not signal a violation of Title VII at the Business School.

Disparate treatment analysis is concerned with intentional discrimination, not subconscious attitudes. Dean Donaldson's statement tells us his view of a subconscious characteristic of the Business School. However, immediately after offering that view, he testified that

> the appointments process, as a process—and certainly it's been my goal all the way through my responsibilities to make sure that the process is as free of any kind of deliberate discrimination, other than discrimination on the question of, do they meet the standards for appointment or not—is as free of discrimination as it can be.

> In other words, I don't believe that either the standards of the university or of the business school, as stated in the appointments manual, or the process by which a review is undertaken, the process for which I was responsible, could be construed as having more than one standard for whoever the candidate might be.

In his direct trial testimony Dean Donaldson amplified his views:

> I do think that it is more difficult for women to achieve tenure, but not because of the standards to which they are held. I believe that some elements of the business community and of society at large have, unfortunately, been reluctant to accept women in roles of leadership traditionally occupied by men. I cannot assume that the Business School faculty of the academic community generally is wholly immune from such attitudes, but I know of no facts suggesting that anyone on the Full Committee has ever opposed any woman candidate for tenure because of her sex.

I find this testimony wholly credible. Therefore, I conclude that in his capacity

as the manager of the Business School's tenure review process during the period relevant to this litigation, Gordon Donaldson met his obligation under Title VII. The race and gender neutral process that he helped establish and maintain may not yet have eliminated "subconscious stereotypes and prejudices" held by some of the Business School's tenured faculty members; however, those subconscious attitudes that may well remain are precisely the sort that disparate treatment analysis cannot and was never designed to police. *Watson*, 108 S.Ct. at 2786–87 (plurality opinion).

#### c. The McArthur Comment

Plaintiff testified that

[i]n a conversation in his office in approximately 1980 John McArthur told me that if "they" (the government and/or the public) wanted women on the faculty in larger numbers, they would have to impose quotas because otherwise Harvard would go through the affirmative action procedures but would not actually promote women. I recall that John made that comment after he complained to me that the affirmative action procedures were onerous.

Defendant McArthur does not recall having ever made the quotas comment attributed to him by plaintiff. In fact, he testified that it is not the sort of comment he would ever make, because, especially when viewed through the discriminatory gloss placed upon it by plaintiff, it runs counter

to his strongly held beliefs. On the basis of all the evidence, however, I have concluded that it is more likely than not that Dean McArthur made some version of the statement attributed to him by plaintiff.

Nonetheless, I find plaintiff's construction of the comment—as meaning no women would be promoted without government-imposed quotas and that the Business School's own affirmative action procedures were windowdressing [25]—to be strained.

### B. *Procedural Irregularities*

#### 1. Stephen Bradley's Placement on 1981 Subcommittee

Professor Stephen Bradley was placed on plaintiff's 1981 Subcommittee over her specific request that he be excluded. Plaintiff maintains that defendants' disregard of her request constitutes evidence of sex discrimination because no similar request by a male candidate was ever disregarded.

Defendants did not introduce any evidence to explain the decision to include Professor Bradley on plaintiff's 1981 Subcommittee. However, in answer to a question I asked during closing argument, defendants' counsel asserted that plaintiff's request to exclude Bradley had been rejected because: (1) plaintiff had made an inordinate number of exclusion requests,[26] thereby severely reducing the pool of professors who were both available and competent to evaluate plaintiff's portfolio; (2) the ground for plaintiff's request was regarded as meritless;[27] and (3) Professor

---

**25.** The Business School, in fact, maintained an affirmative action program designed to identify potential minority and female candidates who could be considered for the tenure position under consideration. For example, Barbara Jackson's 1981 Subcommittee Report, in a section denominated "Outside Comparisons and Affirmative Action," states:

The ten outside reviewers were also queried regarding other possible candidates with special reference to minorities and women. Finally, we solicited from the Area and generated from within the Subcommittee a list of other individuals against whom we might calibrate Jackson's relative strengths and accomplishments. Twenty-five people were identified as relevant comparisons in Marketing. None of these were minority group members

and only one was a woman.... After considering those people, the Subcommittee concluded: There is no member of a minority group, or another woman, whose interest[,] qualities and accomplishments are superior to Jacksons [sic]; individuals of similar ability and accomplishment, ..., would, if candidates for a position at HBS, be complements to Jackson rather than substitutes.

**26.** Plaintiff requested that four persons be excluded from her Subcommittee.

**27.** Plaintiff requested that Bradley be excluded because of alleged bias against women. In defendants' estimation, her evidence for this allegation was weak to the point of being non-existent.

Bradley was especially qualified to evaluate plaintiff's work.

These post-hoc explanations by defendants' counsel for the decision to include Bradley may be correct. There is, for instance, evidence in the case which suggests that plaintiff's reasons for suspecting Professor Bradley of gender bias were rather thin.[28] Moreover, it is true, as defendants contend, that no tenure candidates at the Business School have veto power over appointments to their Subcommittees. These facts, however, do not explain why plaintiff's request to exclude Bradley was not accorded the same deference apparently afforded similar exclusionary requests by male candidates. Thus, I find that in at least this circumstance, plaintiff was treated differently from male tenure candidates.

This disparate treatment does not, however, constitute evidence of discrimination in plaintiff's tenure decision. Plaintiff had no reason based on personal experience to suspect Professor Bradley of gender bias. At most, plaintiff raises the possibility of *personal* bias. Because plaintiff was on the tenure track at the time of Professor Bradley's alleged comment, a fair inference would be that he did not in 1977 consider *her* sufficiently qualified. In any event, plaintiff's impression, and hence her request, was based on hearsay information. That information was hardly overwhelming or unambiguous. In addition, it is undisputed that Professor Bradley was a competent judge of plaintiff's scholarship.

Furthermore, although Professor Bradley voted in the Subcommittee that plaintiff had not met the Business School's tenure standards, he also voted that she should, nevertheless, receive tenure. It was not Professor Bradley's negative vote that was seized upon by those members of the Full Committee who ultimately voted against plaintiff's candidacy in 1981; it appears to have been pervasive doubt about plaintiff's creativity that caused the 1981 rejection. Accordingly, I find that whatever caused Dean McArthur to reject plaintiff's request to exclude Professor Bradley from plaintiff's 1981 Subcommittee, it was not gender bias and it played at most a *de minimus* role in the ultimate decision not to offer plaintiff tenure in 1981.

### 2. Affirmative Action Question to Positive Reviewer

The most enthusiastic 1981 outside reviewer of plaintiff's written work was asked whether affirmative action considerations had played any role in his review. No similar question was asked of plaintiff's least enthusiastic reviewer or of any reviewer of any work by a male tenure candidate.

Like the selection of Stephen Bradley to serve on plaintiff's 1981 Subcommittee, this is an example of disparate treatment without substantial bearing on the ultimate factual issue in this case, i.e., whether defendants intentionally discriminated against plaintiff in denying her tenure. The asking of the affirmative action question in this case did not disadvantage plaintiff, because the reviewer answered that affirmative action had played no conscious part in his evaluation of Ms. Jackson, and that he doubted it had played even a subconscious role. Having received this answer, the Subcommittee appears to have dropped the issue; indeed, in the eyes of the Subcommittee, the credibility of Ms. Jackson's most positive evaluator seems to have been

---

28. Ms. Jackson's grounds for requesting that Dean Donaldson exclude Professor Bradley were communicated to Dean Donaldson as "the story that Sandy Skiba had related to me about Steve Bradley." That story as recounted by Ms. Jackson was as follows:

One day late in the 1976–1977 year, a student named Sandy Skiba came to my office. I had taught her ME in the MBA program. She subsequently became a doctoral student. She came to tell me that she was very upset because of what Steve Bradley had said in a doctoral class. She reported that in teaching a case on EEO, timetables and such Steve had said that HBS was in trouble about EEO and women. She reported that he had said that there were not qualified women that the school could put on the tenure track. She said he continued that therefore the only way for HBS to have senior women was to promote women who were not really qualified. Sandy told me she was especially upset because Steve had made those remarks to the DBA students, a traditionally very important source of new HBS faculty.

enhanced by his response to the affirmative action question. Those who interviewed him "were unanimous in concluding that the interview not only permits one to take [his evaluation] at face value but, indeed, [his] position is somewhat more positive than the letter states."

Nonetheless, the question is worth noting. The enthusiastic reviewers of the work of male candidates are apparently not asked whether their enthusiasm is an effort to compensate for disadvantages faced by white male tenure candidates in an academic world overly concerned with affirmative action. And Ms. Jackson's most critical evaluator, interviewed face-to-face by the Subcommittee, was not asked whether any animosity toward women, or toward affirmative action, played any role in the negative evaluation. Although the Subcommittee's question, if asked across the board of all outside evaluators, would have been appropriate, the fact that it was not asked across the board makes its appearance in Ms. Jackson's Subcommittee Report somewhat peculiar and unsettling. This is especially true in view of the fact that Dean McArthur testified that the question was improper.

The asking of this question, however, does not prove that the Business School sought to write off or discount favorable views of Jackson's work. This would certainly be a different case if the reviewer had stated that his support for affirmative action had possibly played a slight role in his support of Jackson, and defendants' response had been to discredit his evaluation totally. Here the Business School did

nothing of the sort. The fact that the question was asked is thus only marginally significant as circumstantial evidence of gender bias.[29]

### 3. Discussion of Plaintiff's Personality

Plaintiff maintains that during the Full Committee consideration of her candidacy in 1981 and 1983 there was much more discussion of personality than when male candidates came before the Full Committee. She contends that this demonstrates that the Full Committee deliberations over her candidacy were infected by illicit gender-based considerations.

Plaintiff's evidence in support of her contention consists solely of a statement by Professor Regina Herzlinger, the only woman to participate in the Full Committee considerations of plaintiff's candidacy, that "[i]n the discussions of Barbara Jackson's candidacy for tenure, [Professor Herzlinger] perceived that there was much more discussion of personality than in the usual case." However, Professor Herzlinger stated that she "took note of the discussion of Jackson's personality [because she] is herself a woman and was therefore sensitive to the discussion of Jackson's personality.... [and not because of] the relative amount of time given to it." Moreover, as noted above, Professor Herzlinger "does not believe that different criteria are applied to woman than to men in the process of reviewing candidates for promotion to tenure at Harvard Business School. Nor does [Professor Herzlinger] believe that women candidates for tenure have to meet higher standards than male candidates."

---

**29.** It bears noting that this question to Ms. Jackson's most enthusiastic supporter is of a piece with other comments raised by plaintiff as indicative of gender bias at the Business School. At issue here is the difficulty of discussing issues such as affirmative action without running the risk of being misconstrued. The issue of affirmative action is a highly charged one as to which clumsy, off-hand, or tentative formulations may be taken as signs of gender bias. That is the construction, for example, that plaintiff places on the Donaldson, *see supra* Section V.A.2.b., McArthur, *see supra* Section V.A.2.c., and Bradley, *see supra* Section V.B.1., observations. But unless courts are to create an incentive structure for only Bowdlerized discussions

of the topic, the commentary must be read in context with sensitivity to the fact that reservations about—indeed, even opposition to—affirmative action as a public policy are not necessarily evidence of gender bias in a particular case involving the individual qualifications of a person whose group would be advanced by affirmative action. Nevertheless, whenever such comments—even if stray or ambiguously formulated—are made part of the evidence in a discrimination case, they must be carefully considered. Each of the comments here was troubling to some degree. But after cautious reflection, I find that neither alone nor together do the comments provide any material evidence of gender bias in this case.

If plaintiff were correct that discussion of personality was more prominently featured during the Full Committee's deliberations over her candidacy than during the deliberations over male candidacies, that fact would constitute evidence of sex discrimination. *Cf. Price Waterhouse*, 109 S.Ct. at 1790–91 (plurality opinion). Here, however, plaintiff has not produced any evidence in support of her contention. Professor Herzlinger's testimony, taken as a whole, makes it clear that even she does not consider whatever sex stereotyping may have been involved in the discussion of Ms. Jackson's personality to evidence, even subtly or indirectly, gender-biased disparate treatment in plaintiff's review.

### C. Disparate Treatment of Male Candidates

#### 1. Disparate Application of "Creativity" Requirement

The nondiscriminatory reason articulated by defendants for denying plaintiff tenure in 1981 (and 1983) concerned her perceived lack of sufficient creativity.

I have found, as a factual matter, *see supra* Section IV.C.2., that there was no material difference between the creativity requirement under the 1977 and 1981 Standards, and that plaintiff was effectively evaluated under the 1977 Standards in her 1981 evaluation.

Plaintiff maintains that under the 1977 Standards she met the creativity requirement, as evidenced by her 1981 Subcommittee Report. Consequently, she claims, defendants' articulation of her alleged lack of creativity as the reason she was denied tenure was clearly pretextual. In addition, she maintains that a comparison of her creativity evaluation with those of successful male candidates under both the 1977 and 1981 Standards [30] demonstrates that she was held to a higher standard, and thus that defendants' articulated reason for her tenure denial was a pretext for sex discrimination. *See Sweeney*, 604 F.2d at 114 ("One familiar aspect of sex discrimination

is the practice, whether conscious or unconscious, of subjecting women to higher standards of evaluation than are applied to their male counterparts.").

I will analyze plaintiff's contentions in sequence by addressing: (a) whether she met the creativity requirement under the 1977 Standards; and (b) whether she was held to a higher standard of creativity than were successful male candidates.

#### a. Creativity Under 1977 Standards

Under the 1977 Standards, "excellence in course development" and "creative course development" are essentially the same phenomenon. *See* 1977 Standards ¶ 9. Plaintiff acknowledges that to obtain tenure under the 1977 Standards, a candidate who had not demonstrated excellence in research would have had to demonstrate excellence in creative course development. She maintains that under the 1977 Standards excellence in creative course development could be demonstrated in any one of three ways. The 1977 Standards, in subparagraph 2 of paragraph 9 [hereinafter "paragraph 9"], provide:

> Excellence in [creative] course development can be demonstrated in at least one of the following respects: (a) development of new concepts, (b) application of concepts already known in one field to a quite different field, (c) development of pedagogical approaches which greatly increase the ability of students of management to make use of the relevant parts of subjects previously taught in other ways for other purposes.

Plaintiff acknowledges that her work was not sufficient as of December 1981 to demonstrate excellence under either the 9(a) or the 9(b) test. However, she maintains that her work, especially her book, *Computer Models in Management*, met the 9(c) requirement.

Plaintiff claims that *Computer Models in Management* was, as of December 1981, her "key work" showing excellence in

---

**30.** My finding of fact that as applied to this case there were no material differences between the 1977 and 1981 Standards, and my conclusion that in 1981 plaintiff was effectively evaluated

under the 1977 Standards, indicate the appropriateness of comparing plaintiff's 1981 evaluation with those of males who received tenure under the 1977 Standards.

course development. She concedes that it did not contain "new ideas," but asserts that it was "pedagogically creative" and thereby met the creativity requirement of the 1977 Standards as embodied in paragraph 9(c). The 1981 Subcommittee agreed. It concluded that "[h]er materials demonstrate pedagogical creativity, rather than creating new concepts," and that "putting heavy stress on ... pedagogical creativity ...[,] her *Computer Models in Management* course ... met ... [the] standard of creative course development." 1981 Subcommittee Report at 28. Indeed, despite defendants' protestations to the contrary, it is impossible to read the 1981 Subcommittee Report and conclude that the finding of "pedagogical creativity" was not the equivalent of a finding that plaintiff had met the 9(c) definition of creativity, at least with respect to *Computer Models in Management*. Accordingly, plaintiff maintains that if one applies the 1977 Standards, the 1981 Subcommittee Report belies defendants' articulated reason for denying her tenure in 1981. I disagree.

The issue here is not whether reasonable persons found or could have found plaintiff to have been creative under the 1977 Standards—it is obvious that three members of the 1981 Subcommittee found her to be adequately creative and equally obvious that other persons could have reasonably concurred with this assessment. The question is whether a substantial portion of the 1981 Full Committee could have legitimately concluded, on the basis of a fair reading of the 1977 Standards and plaintiff's 1981 Subcommittee Report, that plaintiff had not satisfied the creative course development requisite as of December 1981. The answer to this latter query is yes.

The 1977 Standards state that creative course development may be demonstrated in any one of the three respects listed in paragraph 9. However, paragraph 9 also states that a tenure "candidate must demonstrate convincingly both powers of conceptualization and the ability to implement that conceptualization through course design and materials." This statement may be fairly construed as making first among equals the 9(a) "development of new con-

cepts" method of demonstrating creative course development. At least, it suggests that "mere" pedagogical creativity, i.e., the fulfillment of the 9(c) method, may not in all instances be sufficient to satisfy the 1977 Standard's creative course development requirement. Indeed, this construction of the 1977 Standards is supported by the 1981 Subcommittee's conclusion regarding plaintiff's creativity:

> [Three members of the Subcommittee] putting heavy stress on the pedagogical creativity noted by [several reviewers] and the high quality of the instructor's manual noted by [other reviewers]—consider her *Computer Models in Management* course to meet, by a narrow margin, our standard of creative course development. [The fourth member] considers her work to narrowly fall short of creative course development. [He] does consider her book, *Computer Models in Management*, to be "very good or even excellent but not conceptually creative."

1981 Subcommittee Report at 28. In other words, the three members of the Committee who believed *Computer Models in Management* had enabled plaintiff to meet the creative course development standard did not regard "pedagogical creativity" standing alone to be sufficient to meet the standard; and the fourth member obviously regarded the development of new concepts as the core of creative course development. No one on the Subcommittee appears to have read paragraph 9 of the 1977 Standards in the manner of plaintiff, i.e., as presenting three equal alternative methods of achieving creative course development.

However, even if one were to read paragraph 9 in the fashion suggested by plaintiff, it would still be reasonable to conclude that plaintiff did not meet the creative course development requirement. For even if "pedagogical creativity" had been sufficient to satisfy the requirement, the Subcommittee did not so much find that plaintiff's overall work was "pedagogically creative" as that one element of her portfolio, namely the work on *Computer Models in Management*, was pedagogically creative.

Given Jackson's expressed desire [in 1981] to be a part of the Marketing Area in the future, one of the key questions for the Subcommittee and Full Committee [was] whether the record of teaching, creative course development, and outstanding course maintenance in ME when combined with the work in Marketing to date permit[ted] an adequately confident judgment that Jackson w[ould] soon reach in Marketing the level of achievement she reached in ME.

1981 Subcommittee Report at 41. A substantial number of members of the Full Committee could have reasonably concluded that she would not.

Plaintiff herself concedes that as of December 1981 she had not achieved creative course development in Marketing. In light of this, and of the Subcommittee's conclusion that she had achieved only pedagogical creativity in *Computer Models in Management,* members of the Full Committee could reasonably have concluded that her work in *Computer Models in Management* did not provide an adequate basis from which to predict her future creativity. Though three of the four members of the 1981 Subcommittee came to a different conclusion, fair-minded members of the Full Committee could, and apparently did, disagree with these three.[31]

The reasonableness of the conclusion drawn by a substantial number of members of the Full Committee—that plaintiff had not satisfied the creative course development standard—is supported by numerous critical comments regarding plaintiff's creativity that pock mark her Subcommittee Report. Although the members of the 1981 Subcommittee voted 3–1 that plaintiff

had met the Standards and 4–0 that she should receive tenure, the Subcommittee's Report, when read in its entirety, evidences serious doubts even among members of the Subcommittee concerning plaintiff's creativity. Those doubts were apparently the basis upon which a critical mass of tenured faculty members voted against her tenure application. Applying the 1977 Standards, reasonable faculty members, acting in good faith, could have found that plaintiff had not satisfied the creative course development requirement for tenure. Thus, I find that defendants' articulated reason for denying plaintiff tenure in 1981 was a legitimate reason.

This finding, of course, does not end the inquiry. A legitimate nondiscriminatory reason for the denial of tenure may, nevertheless, be a pretext for sex discrimination. If, as plaintiff maintains, defendants treated men more favorably than women in the application of the 1977 creative course development requirement, that would be evidence of sex discrimination. If, for instance, successful male non-researcher tenure candidates received Subcommittee evaluations of their creative course development so much worse than plaintiff's that reasonable members of the Full Committee could not, in good faith, have concluded that the creativity standard had been met, that would constitute evidence of sex discrimination. *See Sweeney,* 604 F.2d at 114.

#### b. *Creativity of Male Candidates*

Plaintiff maintains that in at least eleven cases,[32] defendants held successful male candidates to a substantially lower creative course development standard than the one to which she was held.[33]

---

**31.** It should be remembered that in the Business School's tenure review process, Subcommittee Reports play a purely advisory role. The recommendations of the Subcommittee are not dispositive.

**32.** Plaintiff contends that but for defendants' destruction of relevant tenure records, *see supra* Section III.A.2., she would have been able to point to numerous other examples of disparate application of the creative course development requirement.

**33.** *See* Plaintiff's Exhibit A, the Subcommittee Report for Candidate 77–2, at 18–23 and 34 (not much creativity in new ways of teaching; controversy regarding creative course development; but candidate is evaluated as "outstanding and creative"); Plaintiff's Exhibit B, the Subcommittee Report for Candidate 77–3, at 33–34 (course work not creative); Plaintiff's Exhibit C, the Subcommittee Report for Candidate 77–4, at 12–15 (found creative because he combines and applies concepts in a new way); Plaintiff's Exhibit D, the Subcommittee Report for Candidate 80–1, at 16 (found creative despite no explicit

In each of the instances highlighted by plaintiff, the Subcommittee evaluations regarding the creative course development requirement were more or less equivocal. However, in no instance were the evaluations such that members of the Full Committee could not have read them and reasonably, in good faith, concluded that the candidates had met the creative course development requirement.

For instance, plaintiff asserts that in 1981 she satisfied her Subcommittee that she was pedagogically creative but was nevertheless denied tenure because she had not demonstrated the ability to develop new concepts, whereas candidates 80–1 and 80–2 received tenure despite the fact that their Subcommittees did not explicitly find that they had developed new concepts. Even if plaintiff's contention is accurate, however, she has not shown disparate treatment. The respective Subcommittees applied the same standards and came to similar conclusions regarding plaintiff and candidates 80–1 and 80–2. The Subcommittee Reports and recommendations do not, however, carry dispositive weight before the Full Committee. Plaintiff's Subcommittee Report was one from which the Full Committee could, and did, conclude that plaintiff had not met the creative course development requirement. The Subcommittee Reports of 80–1 and 80–2 were ones from which the Full Committee could, and did, conclude that these two candidates were sufficiently creative to merit tenure. The fact that the Full Committee came to opposite conclusions about the candidacies of plaintiff on the one hand and 80–1 and 80–2 on the other—or the possibility that I myself might have come to a different conclusion if I had been on the Full Committee—is irrelevant. All that matters is that in each instance the Full Committee acted reasonably and in good faith, without an illicit motive. *See Kumar*, 774 F.2d at 12 (Campbell, C.J., concurring). There is no indication here that it acted otherwise.

### 2. Disparate Application of the 1981 Excellence Standard

Plaintiff maintains that in 1981 she had to demonstrate excellence in both creative course development and research, whereas certain successful males who were evaluated under the 1977 Standards only had to demonstrate excellence in one or the other.[34] Furthermore, plaintiff contends that even after the 1981 Standards were implemented, and all candidates theoretically had to demonstrate excellence in both creative course development *and* research, certain successful males demonstrated excellence in just one or the other.[35] Plaintiff maintains that the difference between the application of the excellence standard to her and to certain successful male candidates constitutes evidence of disparate treatment. Plaintiff's contentions are misplaced.

finding that he created new concepts); Plaintiff's Exhibit E, the Subcommittee Report for Candidate 80–2, at 44, 50, and 56 (found creative despite no explicit finding that he created new concepts); Plaintiff's Exhibit 35, the Subcommittee Report for Candidate 81–3, at 20–21 (world class researcher, but new ground was broken methodologically, not substantively); Plaintiff's Exhibit 36, the Subcommittee Report for Candidate 83–1, at 37 (provided fine critique of existing paradigm, but did not provide an alternative); Plaintiff's Exhibit F, the Subcommittee Report for Candidate 84–2, at 18 (outstanding in course development but no "conceptual breakthrough"); Plaintiff's Exhibit G, the Subcommittee Report for Candidate 84–5, at 23–26 (creative in course development, but no "strikingly new principles, tools, or concepts"); Plaintiff's Exhibit H, the Subcommittee Report for Candidate 84–6, at 4–11 (found creative despite strength in creating new cases rather than new concepts); and Plaintiff's Exhibit I, the

Subcommittee Report for Candidate 84–7, at 19–23 and 35 (no specific conclusion regarding creativity).

**34.** *See* Plaintiff's Exhibit A, the Subcommittee Report for Candidate 77–2, at 12, 17–18, and 38; Plaintiff's Exhibit B, the Subcommittee Report for Candidate 77–3, at 1 and 33; Plaintiff's Exhibit C, the Subcommittee Report for Candidate 77–4, at 7–8 and 19–20; Plaintiff's Exhibit D, the Subcommittee Report for Candidate 80–1, at 2; and Plaintiff's Exhibit E, the Subcommittee Report for Candidate 80–2, at 36–37 and 73.

**35.** *See* Plaintiff's Exhibit 35, the Subcommittee Report for Candidate 81–3, at 13 and 21; Plaintiff's Exhibit F, the Subcommittee Report for Candidate 84–2, at 2–3 and 39; Plaintiff's Exhibit G, the Subcommittee Report for Candidate 84–5, at 1; and Plaintiff's Exhibit I, the Subcommittee Report for Candidate 84–7, at 12–19.

First, despite plaintiff's protestations of unfair treatment in 1981, she was formally evaluated under precisely the same Standards as all male candidates in 1981. All candidates who submitted their portfolios in 1981 had prepared for evaluation under the 1977 Standards, but were formally—and according to plaintiff, unfairly—evaluated under the revised 1981 Standards.

Second, even though the 1981 Standards formally applied to plaintiff's 1981 evaluation, plaintiff was effectively evaluated under the 1977 Standards. *See supra* Section IV.C.2. Plaintiff was not required to demonstrate excellence in both creative course development and research, but merely in creative course development. Thus, the excellence standard applied to plaintiff in 1981 was the same as that applied to all the male candidates she contends received favored treatment, with the exception of one, Candidate 77–3. With this one exception, discussed *infra* in Section V.C.4., each of the males who was successfully evaluated under the 1977 Standards had to demonstrate excellence in either creative course development or research, just like plaintiff.

Third, I have previously found that the 1981 Standards were not materially different from the 1977 Standards. *See supra* Section IV.C.2. The examples plaintiff emphasizes to show disparate application of the 1981 Standards—Candidates 84–2, 84–5, and 84–7—are simply instances in which the Standing Subcommittee, acting pursuant to paragraph 5(b) of the 1981 Standards, "mix[ed]" the creative course development and research requirements to the point where one was emphasized far more heavily than the other. Indeed, many members of the Full Committee apparently "mixed" these requirements in precisely the same fashion for plaintiff in 1983, as evidenced by the majority support plaintiff received from the Full Committee despite what she concedes was a failure to meet the research requirement.

Accordingly, I conclude that the comparison urged by plaintiff, between her evaluations under the excellence standard and those of certain successful male candidates, does not provide evidence of defendants'

alleged intentional gender-based discrimination.

### 3. Successful Males Without Unanimous Subcommittee Recommendations

Plaintiff's 1981 Subcommittee voted 4–0 to recommend that she receive tenure. Indeed, plaintiff's Subcommittee Report was one on the basis of which Dean Donaldson, the person in charge of the promotions process, believed tenure would be granted. The Subcommittee of at least one male tenure candidate, 81–1, split 2–2 on whether to recommend tenure. Nevertheless, candidate 81–1 received tenure. Plaintiff maintains that this disparity is evidence of gender discrimination. She adds that there is no evidence that any candidate for tenure at the Business School other than herself ever received a unanimous recommendation for tenure without ultimately receiving tenure.

I find that comparative Subcommittee recommendations in and of themselves do not constitute evidence of gender discrimination. The Full Committee does not vote the Subcommittee's *Report* up or down. It votes on the individual *candidate*, giving the Subcommittee recommendations whatever weight each voter thinks appropriate. The fact that plaintiff received a 4–0 recommendation for tenure from the members of her Subcommittee assured little more than that she would likely receive at least four votes before the Full Committee.

The fact that Dean Donaldson believed on the basis of her Subcommittee Report that plaintiff would receive tenure is interesting, especially in view of Dean Donaldson's role in the tenure review process. However, the mere fact that the Dean was mistaken does not constitute what plaintiff terms "clear evidence" of sex discrimination. The fact that he was wrong in this prognostication adds nothing to plaintiff's case.

On the basis of the evidence before me, plaintiff appears to be correct in her contention that she is the only Business School tenure candidate who ever received a unanimous Subcommittee tenure recommendation without *ultimately* receiving tenure. However, at least one other candidate, 81–

1, received a unanimous Subcommittee tenure recommendation without *immediately* receiving tenure.

Candidate 81–1 received an extended tenure review analogous to that received by plaintiff. During the 1978–79 school year, he came up for tenure for the first time and his

> subcommittee ... reviewed the evidence and and [sic] was unanimous in recommending promotion. The report was read to the full committee on January 11, 1979, when its recommendation was endorsed by a large majority of those in attendance. After further discussion in the marathon Saturday meeting that followed, the size of that majority diminished and the Dean chose not to recommend promotion, offering instead an extension of [81–1]'s appointment [with] the possibility of another review by the Appointments Committee.

Plaintiff's Exhibit 34, the Subcommittee Report for Candidate 81–1, at 2–3. In other words, the tenure process of 81–1 and plaintiff followed precisely the same path with the exception that the second time around, 81–1 received a 2–2 Subcommittee recommendation and sufficient support from the Full Committee to receive tenure, whereas plaintiff received a unanimous Subcommittee recommendation *against* tenure and failed to receive sufficient support from the Full Committee. The evidence with regard to the votes on candidate 81–1 does not aid plaintiff's claim of disparate treatment, but rather constitutes evidence that Subcommittee votes do not play anything approaching a dispositive significant role in the Full Committee deliberations,[36] and that plaintiff and 81–1 received remarkably similar treatment.

### 4. Lowering of Standards for Males

Plaintiff contends that whereas defendants applied a strict interpretation of the 1981 Standards to her candidacy, defendants lowered the standards to enable at least two male candidates, 77–3 and 84–8, to obtain tenure. Plaintiff's evidence in support of this contention consists of the fact that she was denied tenure in 1981 despite the fact that three of the four members of her 1981 Subcommittee voted that she had met the Standards, whereas candidate 77–3 received tenure despite a Subcommittee vote of 4–0 that he had not met the standards, and candidate 84–8 received tenure after his Subcommittee explicitly decided to weigh "the various parts of [84–8's] work ... somewhat different[ly] from the pattern of weighting suggested in the School's 'Policies and Procedures ...' for the majority of tenure recommendations." Plaintiff's Exhibit J, the Subcommittee Report for Candidate 84–8, at 2.[37]

The Subcommittees for candidates 77–3 and 84–8 expressly modified the Business School's specific published Standards in order to recommend that these two individuals receive tenure. However, in both instances the Standards were overlooked not in an effort to favor males or disfavor females, but for sound educational reasons. These were two exceptional candidates whom the Business School did not want to lose by blindly adhering to the narrowest and strictest conceivable construction of the specific provisions of the published Standards.

Candidate 77–3's Subcommittee recommended him unanimously for tenure as an exception to the Standards because the Subcommittee members found that 77–3 was "a true 'super-star' in the classroom ... [a] status ... not achieved by pure showmanship, but by careful, systematic planning[,] and ... accompanied by real learning." Plaintiff's Exhibit B, the Sub-

---

**36.** It bears noting that even a substantial majority vote of the Full Committee is not always sufficient to induce Dean McArthur to make a tenure recommendation. In 1983, for example, plaintiff received support from 54% of the tenured faculty members present and voting at the meeting of the Full Committee. That year, Dean McArthur declined to recommend tenure for a male candidate who received the support of 73% of the tenured faculty.

**37.** I note that plaintiff herself received a unanimous recommendation of promotion from her 1981 Subcommittee because one member of the Subcommittee voted that she should be promoted as an "exception" to the Business School's normal standards.

committee Report for Candidate 77–3, at 33. In addition, 77–3's Subcommittee found it impossible to "ignore the testimony of so many colleagues about the creativity that [77–3] displays in face-to-face discussions." *Id.* at 34. And despite the fact that the Subcommittee found 77–3 *"not careful, or orderly, or precise,"* it found that "he is not only willing to take intellectual risks, he apparently enjoys doing so." *Id.* 77–3's Subcommittee concluded that

> [w]hen we try to weight these various "dimensions of mental quality" and arrive at an overall score, we arrive at the conclusion that the School will be better off with [77–3] over the next 30 years than without him. Hence, our recommendation.

*Id.*

With reference to 84–8, the Subcommittee acknowledged that while his published written work was not then at the level required by the standards, they recommended him for tenure by placing

> special weight on the candidate's combination of: (1) Intellectual leadership in identifying key managerial issues related to the changing field of ...; (2) His capturing these issues in rich cases; (3) His great skill in presenting this material to a variety of students, including senior managers in ... field, and (4) His emerging skill in presenting these field-based insights in articles. In the first of these three skills [84–8] is not only extremely able, there is no equal in the peer group to replace him. These activities are important in this School's leaderhip in teaching of executives and MBA students.

84–8's Subcommittee Report at 41. I do not find that defendants' willingness to make adjustments for two male candidates because of certain unique (i.e. nonstandardizable) qualities that each possessed, combined with their unwillingness to make an exception for plaintiff, is somehow evidence of defendants' intent to discriminate against plaintiff because of her sex. Institutions such as the Business School must be free to grant tenure to exceptional persons whose work cannot be standardized and who happen to be males, without having to worry that they have created evidence for someone else's Title VII case.

In passing Title VII, Congress did not intend to hamstring academic institutions in the way plaintiff implicitly recommends. The vitality of academic institutions would be severely hampered if colleges and universities, in an effort to stave off Title VII suits, stopped taking chances on those exceptional persons who do not qualify under some standardized mold, but whom the university decision makers instinctually recognize as possessing a sort of greatness. *See Kumar,* 774 F.2d at 11 (Wyzanski, D.J.) (The "very badge of excellence in the selector" [of candidates for tenure] is the ability to "[d]isregard[ ] the ... conventionally-qualified" in favor of the distinguished candidate.).

### 5. Failure to Consider Plaintiff's Entire Record in 1981

Plaintiff maintains that her 1981 Subcommittee did not accord proper weight to her work in ME, but primarily evaluated her work in Marketing, a field in which she had not had an adequate opportunity to develop a record of accomplishment. Plaintiff alleges that successful male candidate 84–5, *see* Plaintiff's Exhibit G, the Subcommittee Report for Candidate 84–5, also changed areas of concentration, but was afforded very different treatment by his Subcommittee. She contends that unlike her Subcommittee, 84–5's Subcommittee was sensitive to the fact that 84–5 had changed areas, and took pains to acknowledge that he was not yet well known in his new field.[38]

As indicated above, *see supra* Section IV.C.4., plaintiff's entire record was taken into account during the course of her 1981

---

**38.** *See, e.g.,* 84–5's Subcommittee Report at 4 ("As indicated by both his assignments and his publication list, [84–5]'s professional accomplishments have been divided between ... and.... In view of this, the Subcommittee believes that we must take into account his work in both areas in arriving at conclusions about his overall performance and his 'quality of mind.' Consequently, we have considered his entire record, and solicited reviews from qualified authorities in both fields, in the course of our deliberations.").

tenure evaluation.[39] Plaintiff's 1981 Sub-committee was just as sensitive to the difficulties resulting from a change of areas as was 84–5's Subcommittee. No disparate treatment is evidenced by a comparison of Plaintiff's 1981 tenure review and 84–5's tenure review.

### 6. Failure to Consider Plaintiff's Entire Record in 1983

Plaintiff maintains that whereas her 1983 Subcommittee limited its review to her monograph, successful male candidate 81–1,[40] who like plaintiff received an "extended" tenure review, had his entire record reviewed when he came up for tenure for the second time.

As indicated above, *see supra* Section IV.E.2., plaintiff's entire career, not just her monograph, was taken into consideration in the ultimate decision regarding her candidacy in 1983. Plaintiff's 1983 Subcommittee focused on her monograph, but even in this sense her review was not different from that of 81–1, whose Subcommittee stated:

> This subcommittee has not endeavored to review the entirety of [81–1]'s career; we have taken as our starting point the evidence and findings of the 1979 review and have concentrated our attention on the following: [a list of 81–1's post–1979 work follows].

81–1's Subcommittee Report at 3. Disparate treatment is not evidenced by a comparison of the extended tenure reviews of plaintiff and 81–1.

### 7. Less Qualified Males Have Received Tenure

Plaintiff maintains that in the estimation of members of the tenured Business School faculty, plaintiff was more qualified to receive tenure than many males who actually received tenure. In fact, Professor Stevenson, a tenured Business School professor,

testified that in his opinion plaintiff was more deserving of tenure than certain tenured males.

It may well be the case that plaintiff is more qualified than tenured males. However, whether or not that is the case is irrelevant in this Title VII action. "[T]he issue is not whether [plaintiff] was qualified for promotion.... The recommendation of the [Dean] is entitled to stand even if it appears to have been misguided, unless it was sex biased." *Sweeney*, 604 F.2d at 112. Pronouncements by plaintiff and her supporters that she was qualified for tenure, even more qualified than tenured males, may be true, but they do not constitute evidence of sex bias.

## VI.

### CONCLUSION

For the reasons set forth above, I find that plaintiff has failed to prove directly, circumstantially, or by a combination of both that the decision to deny her tenure at the Harvard Business School was affected in any fashion by gender discrimination. The decision was the result of a determination by a significant portion of the tenured faculty that Ms. Jackson lacked sufficient qualities of creativity to justify extending a tenured appointment to her. That decision was one on which reasonable persons could and did disagree. But it was not a decision which turned to any degree on the plaintiff's gender.

Accordingly, the clerk is directed to enter judgment for the defendants.

---

**39.** *See, e.g.,* Plaintiff's 1981 Subcommittee Report at 5 ("Two years in Marketing, learning the Area, is an inadequate time to demonstrate excellence within Marketing. Hence, prediction of performance in Marketing based on the ME experience is required. Reasonable judgment can be made but the level of confidence is naturally less than it would be, given more

evidence. Although difficult, your Subcommittee believes that there is an adequate informational basis on which to make a fair and informed judgment.").

**40.** *See* Plaintiff's Exhibit 34, the Subcommittee Report for Candidate 81–1.